UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
Fort Lauderdale Division
www.flsb.uscourts.gov

In re:                                          Case No. 15-28607-BKC-JKO

GARY FRANCIS HOSTE,                             Chapter 7

     Debtor.
_____/

JEFFREY MILLER,                                 Adv. Case No.

     Plaintiff,
vs.

GARY FRANCIS HOSTE,

     Defendant.
_____/

### COMPLAINT OBJECTING TO DISCHARGE AND TO DISCHARGEABILITY OF DEBT

Jeffrey Miller ("Miller"), by counsel, brings this Complaint Objecting to Discharge and Dischargeability of Debt, pursuant to 11 U.S.C. §§ 523 and 727, against Gary Francis Hoste ("Hoste" or the "Debtor"), and in support thereof alleges as follows:

### Jurisdiction and Venue

1.     This case was commenced by the filing of a voluntary Chapter 7 petition on October 20, 2015 (the "Petition Date").

2.     This is an action objecting to Hoste's discharge, pursuant to 11 U.S.C. § 727, and to determine the dischargeability of a debt, pursuant to 11 U.S.C. § 523.

3.     This is a core proceeding and this Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157 and 1334 and Fed. R. Bankr. P. 7001.

4.     Venue is proper herein pursuant to 28 U.S.C. §§ 1408 and 1409.

### Parties

5.     Hoste is the debtor of the above-referenced bankruptcy proceeding.

6.     Miller is a creditor of the above-referenced bankruptcy estate, having filed Claim # 6-1 on March 23, 2016 in the amount of $490,084.91, including a secured claim amount of $36,625.80 (the "Miller Claim").

## Miller's Business Dealings with Hoste

7.     At all relevant times, Hoste was a licensed chiropractor in the State of Florida and Miller was a licensed chiropractor in the State of California.

8.     UCRC, Inc. ("UCRC") was a Florida corporation that was incorporated on or about February 27, 2004 by George Coufal. A copy of the Articles of Incorporation of UCRC is attached as Exhibit "I."

9.     UCRC was formed for the purpose of operating a chiropractic center doing business as "Universal Chiropractic," having its principal place of business at 3838 N. University Drive, Sunrise, Florida 33151. A true and correct copy of the fictitious name registration, dated March 2, 2004, is attached as Exhibit "2."

10.     Miller and Hoste first became acquainted with each other as classmates at Life Chiropractic College West in Hayward, California, in approximately 1994.

11.     Between 1996 and 2005, Hoste worked intermittently for Miller in the chiropractic field. In approximately 2005 or 2006, Hoste relocated to Florida.

12.     On or about April 2007, Hoste was working in Florida as a salaried chiropractic physician for UCRC.

13.     On or about April 2007, Hoste began to speak about Miller about his desire to acquire UCRC for a purchase price of approximately $400,000. Hoste told Miller at that time that Hoste, together with Satyam Patel ("Patel") who was an investor, were contemplating a purchase of the chiropractic venture from the extant shareholders of UCRC, namely Kent Bernarduci ("Bernarduci") and Robert Findlay ("Findlay").

14.     Hoste orally communicated to Miller certain concerns that Hoste had about the contemplated acquisition of UCRC. Amongst Hoste's concerns were that Hoste himself

lacked the financial capacity either to purchase UCRC or to contribute capital towards the financing of and acquisition of UCRC; that Patel had insufficient knowledge of the chiropractic field; and that Hoste was unsure as to how to structure the transaction.

15.     The discussions between Hoste and Miller about Hoste's intended acquisition of UCRC continued for many months. In the beginning of the discussions, it was anticipated by Hoste that Patel would secure a loan to finance the purchase of UCRC.

16.     Eventually, Hoste came to understand that Patel, with or without Hoste's assistance, lacked the requisite business acumen and/or financial wherewithal to either purchase UCRC or to secure a loan to finance the acquisition of UCRC. Accordingly, in late summer/early autumn of 2007, Hoste began to ask Miller whether Miller would like to join Hoste as a "50/50 partner" in the purchase of UCRC.

17.     In response to Hoste's request, Miller began due diligence to evaluate the risks and benefits of the proposed deal. Throughout the period between August and October, 2007, Miller, together with Hoste, reviewed material UCRC financial data, including, inter alia, the UCRC Form 1120S federal tax returns for 2005 and 2006, and traveled to visit the UCRC practice in Sunrise, Florida on multiple occasions.

18.     On or about September 2007, Miller concluded that the investment opportunity in UCRC was attractive. Accordingly, sometime in or around October, 2007, Miller and Hoste entered into an oral agreement between themselves to jointly purchase the stock of UCRC for the purposes of operating Universal Chiropractic.

19.     Pursuant to the terms of the oral agreement, in consideration for a 50% interest in UCRC, Miller was obligated (1) to arrange for and secure a bank loan to purchase the ongoing practice, (2) to provide whatever money that was necessary as a down payment to secure the loan and consummate the acquisition, (3) to provide whatever additional incidental monies would be required to effectuate the purchase agreement, and (4) to participate in marketing efforts as appropriate to expand the ongoing UCRC business.

20.     Pursuant to the terms of the oral agreement, in consideration for a 50% interest in UCRC, Hoste, as a licensed chiropractor in Florida (which Miller is not), was obligated to operate the practice.

21.     The oral agreement contemplated that both Hoste and Miller, as officers of the corporation, would draw a reasonable salary in consideration for their respective contributions of services performed for UCRC, in conformity with the requirements of Florida statutes.

22.     Throughout the period between October and December 2007, Hoste introduced Miller to the sellers of UCRC and referred to Miller at all times as his "partner" in the acquisition. At all times material, Hoste represented to the sellers of UCRC that Miller and Hoste would each be equal owners of the to-be-acquired UCRC stock.

23.     Throughout the period between October and December 2007, Miller began to negotiate the terms of the acquisition with the UCRC principals. Miller, together with Hoste, reviewed and analyzed proposed terms for the purchase in various redactions.

24.     On or about December 21, 2007, Bernarduci wrote a letter to Hoste and Miller which contained the material terms of an "official offer" relating to the acquisition by Hoste and Miller of UCRC (the "Official Offer").

25.     On or about December 27, 2007, Hoste and Miller wrote a letter of intent ("Letter of Intent") directed to Bernarduci and Findlay outlining an updated understanding of proposed material terms of the acquisition of UCRC by Hoste and Miller.

26.     The Letter of Intent established a purchase price of $475,000 for UCRC.

27.     The Letter of Intent obligated Hoste and Miller as purchasers to make a $10,000 good faith deposit into an escrow account held by sellers' attorney Steven Lander, Esq. ("Lander") within ten (10) business days of the signing of the Letter of Intent. The good faith deposit was designated as refundable if Hoste and Miller failed in their efforts to secure financing to enable the acquisition.

28.    On or about January 26, 2008, Miller tendered the required $10,000 payment into the escrow account held by attorney Lander. The good faith deposit was tendered from Miller's personal accounts.

29.    From December 27, 2007 through June 3, 2008, Miller worked tirelessly with lender CIT Small Business Lending Corporation (hereinafter, "CIT" or "the Lender") to secure the requisite financing for the UCRC acquisition. During this time, Miller participated in negotiating material terms of the loan and performed all tasks necessary to ensure compliance with the Lender's exhaustive checklist of conditions precedent to the closing of the loan.  During this time, Miller flew from California to Florida approximately once every two weeks to ensure that the CIT loan would come to fruition and to work on business development for UCRC.

30.    On or about March 6, 2008, Hoste and Miller, as the designated "Purchasers," entered into a Stock Purchase Agreement ("UCRC Stock Purchase Agreement") with Bernarduci and Findlay, as Sellers, pursuant to which Sellers agreed to deliver 100% of the outstanding shares of UCRC, Inc. in consideration of a $475,000 purchase price. A true and correct copy of the UCRC Stock Purchase Agreement is attached as Exhibit "3."

31.    The UCRC Stock Purchase Agreement contemplated a closing date for the loan transaction to occur within fifteen days of May 6, 2008, subject to placement of the CIT loan and licensing from the Florida Agency for Health Care Administration ("AHCA").

32.    By subsequent stipulation of all parties, the closing date for the loan transaction was ultimately extended until June 30, 2008.

33.    On or about March 2008, CIT representative Mark Thompson ("Thompson") orally represented to Hoste and Miller that the loan processing would proceed more smoothly if Hoste were listed on the loan documents as an eighty-five percent (85%) owner

of the purchasing entity. Thompson based this statement on the fact that Hoste's personal credit rating was superior to Miller's.

34.     Accordingly, Hoste and Miller agreed that for purposes of securing the loan, Hoste and Miller would be listed on all loan documents as having 85% and 15% ownership interests, respectively, in UCRC.

35.     Hoste and Miller further agreed with Thompson that Hoste and Miller would be listed as having 85% and 15% ownership interests, respectively, on all licensing applications which Hoste and Miller were in the process of preparing for the Florida Agency on Health Care Administration ("AHCA").

36.     It was understood between and amongst Hoste, Miller and Thompson that Hoste and Miller would then enter into a Stock Purchase Agreement for the purpose of restoring the intended equal partnership interests (Hoste 50%; Miller 50%) in UCRC, to become effective upon the acquisition of UCRC. It was further understood between and among Hoste, Miller and Thompson that CIT assented to such an executory share transfer, creating an equal ownership interest between Hoste and Miller. Moreover, the express terms of the AHCA license application allowed for a transfer of up to 35% of the shares without the need to re-file the AHCA license application.

37.     On or about April 26, 2008, Hoste and Miller entered into a Stock Purchase Agreement (the "Hoste Stock Purchase Agreement"), pursuant to which Hoste committed to transfer thirty-five shares of capital stock of UCRC, Inc., representing thirty-five percent (35%) of the company's outstanding shares, to Miller, such transfer to occur at the closing of Hoste's and Miller's acquisition of UCRC. A true and correct copy of the Hoste Stock Purchase Agreement is attached as Exhibit "4."

38.     On or about June 27, 2008, CIT representative Kathy Forbes-Hunter sent an e-mail to Hoste and Miller notifying them that the Small Business Administration requires

that when two unrelated individuals purchase the stock of a corporation, the individuals must form a new entity to hold title to the shares of the corporation.

39.    In compliant response to the e-mail notice of Kathy Forbes-Hunter of the SBA requirement, on June 30, 2008, Hoste and Miller formed UCRC Holdings, Inc. ("UCRC Holdings"), a Florida corporation. The Articles of Incorporation designated Hoste as President and Director of the corporation; the Articles of Incorporation designated Miller as Vice-President and Secretary of the corporation. See Exhibit "5".

40.    The acquisition of UCRC by UCRC Holdings was consummated along with the closing of the loan on or about June 30, 2008 (the "Closing Date"). The transfer of stock certificates from the sellers of UCRC to Hoste and Miller, each as 50% owners of UCRC Holdings, occurred contemporaneously on the Closing Date.

41.    Since the Closing Date, Hoste has at all times maintained exclusive possession, custody and control over all of the corporate documents of UCRC and UCRC Holdings. Upon information and belief, the corporate documents contain, inter alia, the stock certificates reflecting the ownership of UCRC by UCRC Holdings (or, alternatively, Hoste and Miller), as such duly executed certificate[s] are required by UCRC's Corporate Bylaws.

42.    On the Closing Date, it was understood by Hoste, Miller, the sellers of UCRC stock and all agents or employees of CIT involved with the loan transaction, that Hoste and Miller each would be a director of UCRC and UCRC Holdings and that each would participate actively and equally in the management and decision-making involved in operating the corporation. It was, further, the understanding and intention of all the parties that, corporate resources permitting, each would receive distributions from UCRC in equal amounts as long as each assumed an active and ongoing responsibility for carrying a portion of the burdens necessary to operate the business.

43.    Between December 27, 2007 through June 3, 2008, in the presence of Miller, Hoste at all times represented that Miller was Hoste's "partner" and that Miller was to be a

50% owner/partner of UCRC upon the completion of the acquisition. Among the persons to whom Hoste represented that Miller was Hoste's full partner and a prospective 50% owner of UCRC were the following: Bernarduci; Findlay; Patel; Thompson, Lander; Bob Hovenan (UCRC's accountant); Dr. Stuart Sherman (Hoste's friend); William Chacon (Hoste's friend); and Donald Rosen (the then-deputy mayor of Sunrise, Florida).

44.     Approximately one week after the Closing Date, Bob Hovenan, certified public accountant for UCRC and UCRC Holdings, requested that Hoste and Miller each sign and submit Internal Revenue Service forms (such as a Form 2553 election to be taxed under Subchapter S of Chapter 1 of the Internal Revenue Code), indicating that Hoste and Miller each had a 50% ownership interest in UCRC Holdings. Copies of the subject IRS documents have been at all times material within the exclusive possession, custody, and control of Hoste.

45.     On or about August 2008, Hoste and Miller had a business development meeting with attorneys and other personnel from the Hollywood, Florida law firm of Dell & Schaefer, P.A. in an attempt to market their chiropractic services. At the meeting, Hoste and Miller were seeking a commitment from the attorneys to refer their personal injury clients to UCRC for treatment. At the meeting with Dell & Schaeffer, Hoste at all times represented that Miller and Hoste each had a fifty percent (50%) ownership interest in UCRC and/or UCRC Holdings.

46.     Between December 2007 and August 2008, in multiple conversations, Hoste told his friend Dr. Stuart Sherman that Hoste needed Miller to complete the deal for UCRC because Hoste lacked Miller's experience, marketing savvy, and knowledge to operate a chiropractic business. Further, Hoste confided in Sherman that Hoste had no money and was thus unable to afford to purchase UCRC by himself. Hoste specifically represented to Sherman that in consideration for Miller's services and cash contributions, Miller was going to become, and in fact did become, a 50% owner of UCRC and UCRC Holdings.

47.    Between December 2007 and May 2008, Hoste and Miller met with Don Rosen, the then-deputy mayor of Sunrise, Florida, for the purpose of discussions relating to the "lay of the land" in developing a chiropractic practice within the municipality. Hoste and Miller discussed with Rosen various logistics relating to corporate marketing, regulatory requirements, and participation in the municipal insurance plan. At the meeting with Mr. Rosen, Hoste specifically represented that Hoste and Miller were "equal partners" in the chiropractic venture.

48.    Between October 2007 and August 2008, Miller contributed cash, property, and the aforedescribed services in consideration for a fifty percent (50%) ownership interest in UCRC and UCRC Holdings, and in reliance upon Hoste's representations that Miller would be an equal equity partner in UCRC and UCRC Holdings.

49.    Specifically, Miller contributed cash of Twenty Thousand One Hundred Forty-Two and 25/100 ($20,142.25), as follows: Eight Thousand Dollars ($8,000) on or about the Closing Date to consummate UCRC Holdings' acquisition of UCRC through the loan secured with CIT; Ten Thousand Dollars ($10,000) deposit on or about January 26, 2008 into an escrow account held by attorney Stephen Lander for the benefit of the UCRC Sellers; Two Thousand Forty-Two and 25/100 Dollars ($2,042.25) for fees to AHCA, including fingerprinting, on or about March 3, 2008; $100 for purchase of shares of UCRC Holdings common stock from Hoste, on or about June 30, 2008.

50.    Specifically, Miller contributed property as follows: two (2) computers; 1 external hard drive; 1 briefcase; 2 suitcases; office furniture; a full wardrobe; and personal effects, of an aggregate approximate value of Eighteen Thousand Dollars ($18,000).

51.    In addition, between December 2007 and August 2008, Miller incurred travel expenses of approximately Four Thousand Six Hundred Dollars ($4,600) and miscellaneous other business expenses which were advanced personally by Miller on behalf of UCRC (and/or UCRC Holdings) in an approximate aggregate amount of Four Thousand Two

Hundred Dollars ($4,200). It was expressly agreed between Hoste and Miller that the travel and business expenses incurred by Miller were to be reimbursed by UCRC.

52.     Beginning in late August or early September 2008, shortly after the UCRC acquisition by Hoste and Miller, Hoste inexplicably began to avoid communications initiated by Miller, including notices provided by Miller that he was canceling various marketing events in view of Hoste's silence, and including requests made by Miller as a shareholder of UCRC and UCRC Holdings for access to corporate documents, including access to the corporate books and records.

53.     In view of Hoste's evasive conduct, Miller feared a squeeze-out by Hoste and duly noticed an October 14, 2008 special meeting of the officers and directors of UCRC Holdings at which Miller intended to address the potential issues of squeeze-out and oppressive conduct by Hoste by acting as a controlling shareholder without controlling authority as a fifty percent (50%) shareholder.

54.     Hoste ignored the notice of the special meeting of the officers and directors of UCRC Holdings and did not appear at the special meeting on October 14, 2008.

55.     Unbeknownst to Miller at the time that he noticed the October 14, 2008 special meeting, Hoste had already taken unilateral action to amend the Articles of Incorporation of UCRC Holdings on October 3, 2008, to reflect that Hoste was the sole initial officer and/or director of the corporation. A true and correct copy of the Articles of Amendment to Articles of Incorporation of UCRC Holdings (the "Articles of Amendment") is attached as Exhibit "6."

56.     The Articles of Amendment to the UCRC Holdings Articles of Incorporation further represented that the adopted amendment, which effectively squeezed out Miller as an officer and director of UCRC Holdings, was approved by a majority vote of the shareholders, which representation was signed by Hoste.

57.     By signing the Articles of Amendment, Hoste intentionally misrepresented that corporate action had been duly taken by a sufficient number of shareholder votes when in fact Hoste had knowledge that no such shareholder vote ever took place.

58.     By signing the Articles of Amendment and intentionally misrepresenting that corporate action was duly taken when it was not, Hoste acted unlawfully in violation of Florida statutes, and with malice and oppression, in willful disregard to the rights of Miller as an investor, shareholder, and director of UCRC Holdings and UCRC.

59.     By signing the Articles of Amendment and intentionally misrepresenting that corporate action was duly taken when it was not, Hoste violated the express terms of the loan with CIT which require that any change of ownership only be made with the Lender's consent.

60.     Upon information and belief, since Hoste began to operate UCRC, Hoste drew a salary in excess of the salary which was agreed to by Hoste and Miller and in excess of a reasonable salary commensurate with the reasonable salary of a chiropractic physician of similar skill and experience practicing in a similar locality.

61.     Upon information and belief, since Hoste began to operate UCRC, Hoste diverted corporate revenues for his own personal financial benefit by creating disbursement ledger entries for purported corporate expenditures which lack documentary support.

62.     Upon information and belief, since Hoste began to operate UCRC, Hoste took advantage of corporate opportunities for his personal financial aggrandizement and preferentially paid distributions to himself at the expense of other shareholders, and in wanton and reckless disregard for the rights of Miller, who had an equal equity interest in corporate distributions.

63.     The aforestated acts of Hoste were wrongful and committed for the purpose and effect of diminishing the value of Miller's interest in UCRC and UCRC Holdings relative to Hoste's interest in these corporations.

64.     As a direct and foreseeable result of Hoste's self-dealing, commingling, mismanagement, and fraudulent misrepresentation and concealment, Miller's equity interest in UCRC and UCRC Holdings was seriously jeopardized and damaged.

65.     Miller demanded that Hoste allow Miller to conduct a full and open audit of operations of UCRC. In response, Hoste expressly refused to cooperate to permit such an audit. Miller further requested that Bob Hovenan, Certified Public Accountant, provide Miller with access to corporate tax records of UCRC and UCRC, Inc., and Hovenan indicated that he was instructed by Hoste not to provide Miller with access to those records.

## The Federal District Court Lawsuit

66.     As a result of the foregoing, on August 31, 2011, Miller commenced a Complaint and Verified Shareholder Derivative Petition (the "Complaint") against Hoste and UCRC and UCRC Holdings, as nominal defendants, in the United States District Court for the Southern District of Florida (the "District Court Action"), Case No. 0:11-cv-61946-RSR, for declaratory relief, equitable accounting, conversion, civil theft, unjust enrichment, common law fraud and breach of fiduciary duty (as part of the shareholder derivative petition). A true and correct copy of the Complaint is attached hereto as Exhibit "7".

67.     On March 6, 2013, United States District Judge Robin S. Rosenbaum entered an Order on Plaintiff's Motion for Partial Summary Judgment in the District Court Action, whereby certain factual findings were made. *See* attached Exhibit "8".

68.     Thereafter, Miller and Hoste settled the District Court Action, which resulted in a Final Judgment Upon Consent, entered in the District Court Action, in the amount of $500,000.00. *See* attached Exhibit "9".

## Hoste's Bankruptcy Filing

69.     As stated above, Hoste filed a voluntary petition for Chapter 7 bankruptcy relief on the Petition Date [ECF No. 1]. The voluntary petition was accompanied by Hoste's initial schedules and statement of financial affairs, signed under penalty of perjury [ECF

Nos. 1 and 4] (the "Original Schedules"). Subsequently, on October 23, 2015 and November 9, 2015, Hoste amended his Schedule F to add additional creditors, also under penalty of perjury [ECF Nos. 11, 14 and 15] (the "First Amended Schedules").

70.    Sonya L. Salkin (the "Trustee") was duly appointed as the Chapter 7 trustee in Hoste's Chapter 7 case.

71.    The Trustee conducted the initially-scheduled § 341 Meeting of Creditors ("Initial 341 Meeting"), with Hoste placed under oath, in the bankruptcy case on November 23, 2015. Hoste was accompanied by his then counsel of record, Matthew McGuigan, Esq. Under direct questioning by the Trustee, Hoste offered no oral amendments or additions to his scheduled assets, other than a discussion of certain medical equipment not directly accounted for on his Original Schedules or First Amended Schedules.

72.    After her direct questioning at the Initial 341 Meeting, the Trustee opened the floor to questions from creditors, as two creditors had appeared through counsel, including Miller's non-bankruptcy counsel. Only upon questioning from counsel for Miller was it first revealed that Hoste had funded, either directly or through businesses dominated by Hoste, the acquisition of a substantial quantity of gold and silver (with aggregate purchase prices exceeding $200,000.00) in the form of bullion and non-collectable coins (the "Precious Metals") in the years preceding the Petition Date. The Precious Metals were not scheduled in any way on the Original Schedules or First Amended Schedules.

73.    In addition to the complete omission of the Precious Metals from the Original Schedules and First Amended Schedules, Hoste's Original Schedules, First Amended Schedules and Initial 341 Meeting testimony failed to disclose the existence of, or any transfers to, a corporate entity now entitled Your Doctors Center LLC ("Your Doctors Center"), formed on September 17, 2015, just over a month prior to the Petition Date.[1]

---

[1] Your Doctors Center was originally organized under the name "Your Doctor Medical Center LLC" on September 17, 2015, with the name changed to Your Doctors Center LLC by a filing with Florida Secretary of State, Division of Corporations, on November 12, 2015.

**The Precious Metals**

74.      Subsequent investigation has revealed that Hoste, either directly or through the corporate entities owned and dominated by Hoste, had acquired large amounts of gold and silver, with a purchase price exceeding $200,000.00, during the period starting no later than October 2009 and ending no sooner than June 2013.   At least some of these transactions were, finally, disclosed on Hoste's belatedly-filed Amended Schedules filed on January 29, 2016 (the "Second Amended Schedules") [ECF No. 56], specifically at pages 16, 19-43.

75.      Upon information and belief, the Precious Metals purchased by Hoste in the years 2009 through 2011 were stored domestically in the United States.

76.      Upon information and belief, in the months prior the filing of the District Court Action, Hoste and his wife, Cindi Chan ("Chan"), were well aware of the dispute with Miller that ultimately led to the filing of District Court Action.

77.      Accordingly, on or about April 28, 2012, Chan executed an agreement to ship the bulk of the then-existing Precious Metals to in a facility in Montreal, Quebec, Canada, called Entreposage Store-Wel Enr. (the "Montreal Facility"). Subsequently, the Precious Metals stored in the Montreal Facility were repatriated to the United States for shipment to a facility in Singapore called The Safe House SG PTE Ltd. ("Safe House").

78.      Accordingly, on or about October 5, 2015, some 15 days before the Petition Date, Chan executed an agreement to utilize the services of Loomis International (US) Inc. ("Loomis") to ship all of the gold holdings, and much of the silver holdings, of the Precious Metals to The Safe House in Singapore. Subsequently, in accordance with such agreement, Loomis did in fact ship the Precious Metals, with the exception of a relatively small quantity of silver, to The Safe House, with whom Chan had executed a storage agreement on or prior to October 16, 2015.

**Your Doctors Center**

79.     From at least June 2008 until shortly before the Petition Date, Hoste worked as chiropractor, exclusively through business entities for which he was no less than a 50% owner. The last such entity, Gary Hoste, DC ("GDDC"), started in 2013, was 100% owned by Hoste.

80.     Nevertheless, on September 17, 2015, approximately one month prior to the Petition Date, Hoste and Chan created Your Doctors Center to serve as Hoste's new employer. Notwithstanding that Chan was (a) not a chiropractor herself and (b) provided no capitalization of the new company, ownership of Your Doctors Center was split 99% to Chan and 1% to Hoste.  Hoste supplied all of the existing equipment, patients, patient lists, goodwill and other intangibles of GDDC to Your Doctors Center without any payment—and for only a 1% share of the new company.

**Count 1 – Objection to Discharge (11 U.S.C. § 727(a)(2)(A))**

81.     Miller re-alleges all of the allegations set forth in each of the paragraphs above.

82.     This is an action requesting the denial of Hoste's discharge, pursuant to 11 U.S.C. § 727(a)(2)(A).

83.     Miller is a creditor of Hoste.

84.     The afore-described actions of Hoste as to the Precious Metals and Your Doctors Center constitute transfers, removal and/or concealment of property that Hoste, within one year of the Petition Date, undertook with the actual intent to hinder, delay or defraud Miller and other creditors of Hoste.

85.     Accordingly, the actions of Hoste were in contravention of 11 U.S.C. § 727(a)(2)(A), requiring that Hoste's discharge now be denied.

WHEREFORE, Miller requests that the Court enter a judgment denying Hoste's discharge.

## Count 2 – Objection to Discharge (11 U.S.C. § 727(a)(4))

86.     Miller re-alleges all of the allegations set forth in each of the paragraphs above.

87.     This is an action requesting the denial of Hoste's discharge, pursuant to 11 U.S.C. § 727(a)(4).

88.     The failure of Hoste to schedule the acquisition and holding of the Precious Metals in his Original and First Amended Schedules was done knowingly and fraudulently, and resulted in Hoste making a false oath in connection with the execution of his Original and First Amended Schedules, as well as his testimony at the Initial 341 Meeting.

89.     The failure of Hoste to schedule the creation of, and his interest in, Your Doctors Center was done knowingly and fraudulently, and resulted in Hoste making a false oath in connection with the execution of his Original and First Amended Schedules, as well as his testimony at the Initial 341 Meeting.

90.     Accordingly, the actions of Hoste were in contravention of 11 U.S.C. § 727(a)(4), requiring that Hoste's discharge now be denied.

WHEREFORE, Miller requests that the Court enter a judgment denying Hoste's discharge.

## Count 3 – Non-Dischargeability of the Miller Claim (11 U.S.C. § 523(a)(2)(A))

91.     Miller re-alleges all of the allegations set forth in each of the paragraphs above.

92.     This is an action requesting a determination that the debt owed by Hoste to Miller is excepted from Hoste's discharge and is not dischargeable, should Hoste receive a discharge, pursuant to 11 U.S.C. § 523(a)(2)(A).

93.     Hoste incurred the debt to Miller under false pretenses, false misrepresentations, and/or actual fraud.

94.     Specifically, Hoste made a false representation, as described above, in order to deceive Miller.

95.     Miller relied on the misrepresentation.

96.     Such reliance was justified.

97.     Miller sustained a loss, in the form of the Miller Claim, as a result of the misrepresentation.

98.     Furthermore, Hoste's scheme of removing and concealing the Precious Metals and Your Doctor's Center from the reach of Miller and other creditors is a fraudulent conveyance scheme that constitutes fraud. *Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581 (2016).

WHEREFORE, Miller respectfully requests that the Court enter a judgment determining that the debt(s) owed to Miller by Hoste (i.e. the Miller Claim) are non-dischargeable, in the amount of $490,084.91, plus interest and costs.

### Count 4 – Non-Dischargeability of the Miller Claim (11 U.S.C. § 523(a)(4))

99.     Miller re-alleges all of the allegations set forth in each of the paragraphs above.

100.    This is an action requesting a determination that the debt owed by Hoste to Miller is excepted from Hoste's discharge and is not dischargeable, should Hoste receive a discharge, pursuant to 11 U.S.C. § 523(a)(4).

101.    The actions referenced above by Hoste constituted fraud or defalcation while acting in a fiduciary capacity.

102.    Specifically, a trust was created, whereby Hoste was held to equitable duties to deal with property of the corporations referenced above, for the benefit of Miller.

103.    The Miller Claim was caused by Hoste's fraud and defalcation while he acted in such fiduciary capacity.

104.    Hoste acted as a fiduciary to Miller at the time that the Miller Claim was created.

105.    The actions referenced above by Hoste were also in the nature of embezzlement and/or larceny and/or conversion.

WHEREFORE, Miller respectfully requests that the Court enter a judgment determining that the debt(s) owed to Miller by Hoste (i.e. the Miller Claim) are non-dischargeable, in the amount of $490,084.91, plus interest and costs.

### Count 5 – Non-Dischargeability of the Miller Claim (11 U.S.C. § 523(a)(6))

106.    Miller re-alleges all of the allegations set forth in each of the paragraphs above.

107.    This is an action requesting a determination that the debt owed by Hoste to Miller is excepted from Hoste's discharge and is not dischargeable, should Hoste receive a discharge, pursuant to 11 U.S.C. § 523(a)(6).

108.    The actions referenced above by Hoste constituted a willful and malicious injury (or injuries) by Hoste to Miller and/or Miller's property.

109.    Specifically, Hoste engaged in willful conduct, as evidenced above.

110.    Hoste acted with malice and indented to injure Miller and/or Miller's property.

111.    Hoste's actions were wrongful and without just cause.

112.    Miller sustained a loss, in the form of the Miller Claim, as a result of Hoste's actions.

WHEREFORE, Miller respectfully requests that the Court enter a judgment determining that the debt(s) owed to Miller by Hoste (i.e. the Miller Claim) are non-dischargeable, in the amount of $490,084.91, plus interest and costs.

Dated: July 15, 2016

LEIDERMAN SHELOMITH ALEXANDER
+ SOMODEVILLA, PLLC
Counsel for Miller
2699 Stirling Road, Suite C401
Ft. Lauderdale, Florida 33312
Telephone: (954) 920-5355
Facsimile: (954) 920-5371

By:_____/s/_____
        ZACH B. SHELOMITH
        Florida Bar No. 0122548
        zbs@lsaslaw.com

P04000038735

# Florida Department of State
Division of Corporations
Public Access System

## Electronic Filing Cover Sheet

**Note: Please print this page and use it as a cover sheet.** Type the fax audit number (shown below) on the top and bottom of all pages of the document.

### (((H04000043290 3)))

**Note:** DO NOT hit the REFRESH/RELOAD button on your browser from this page. Doing so will generate another cover sheet.

To:
    Division of Corporations
    Fax Number    : (850)205-0381

From:
    Account Name   : FILINGS, INC.
    Account Number : 072720000101
    Phone        : (850)385-6735
    Fax Number    : (954)641-4192

# FLORIDA PROFIT CORPORATION OR P.A.

## UCRC, INC.

| | |
|---|---|
| Certificate of Status | 0 |
| Certified Copy | 0 |
| Page Count | 04 |
| Estimated Charge | $70.00 |

04 FEB 27 PM 2:44
SECRETARY OF STATE
TALLAHASSEE, FLORIDA
FILED

**Electronic Filing Menu**    **Corporate Filing**    **Public Access Help**

Exhibit "1"

H04000043290

04 FEB 27 PM 2:44

SECRETARY OF STATE
TALLAHASSEE, FLORIDA

## ARTICLES OF INCORPORATION

### OF

### UCRC, INC.

### ARTICLE I

#### Name

The name of this corporation is

#### UCRC, INC.

### ARTICLE II

#### Duration

This corporation shall have perpetual existence.  The effective date of this corporation shall be FEBRUARY 26, 2004.

### ARTICLE III

#### Purpose

This corporation is organized for the purpose of transacting any or all lawful business.

### ARTICLE IV

#### Capital Stock

This corporation is authorized to issue ONE HUNDRED (100) shares of One Dollar ($1.00) par value common stock.

### ARTICLE V

#### Pre-Emptive Rights

Every shareholder, upon the sale for cash of any new stock of this corporation of the same kind, class or series as that prorata share thereof (as nearly as may be done without issuance of which he already holds, shall have the right to purchase his fractional shares) at the price at which it is offered to others.

H04000043290

H04000043290

## ARTICLE VI

### Initial Registered Office and Agent

The street address of the initial registered office of this corporation is 3838 North University Drive, Sunrise, Florida 33351 and the name of the initial registered agent of this corporation at the address is Dr. Robert Findlay.

## ARTICLE VII

### Principal Business Address

The corporation's principal place of business will be located at 3838 North University Drive, Sunrise, Florida 33351.

## ARTICLE VIII

This corporation shall have Two (2) directors initially. The number of directors may be either increased or diminished from time to time by the Bylaws but shall never be less than one. The name and address of the initial director(s) of this corporation is:

| Name | Address |
|------|---------|
| Robert Findlay President | 3838 North University Drive Sunrise, Florida 33351 |
| George Coufal President | 3838 North University Drive Sunrise, Florida 33351 |

## ARTICLE IX

### Incorporator

The name and address of the person(s) signing these Articles is:

H04000043290

H04000043290

| Name | Address |
|------|---------|

George Coufal          3838 North University Drive
President              Sunrise, Florida 33351

### ARTICLE X

#### Indemnification

The corporation shall indemnify any officer or
director or any former officer or director to the full extent
permitted by law.

### ARTICLE XI

This corporation reserves the right to amend or
repeal any provision contained in these Articles of
Incorporation, or any amendment hereto, and any right conferred
upon the shareholders is subject to this reservation.

IN WITNESS WHEREOF, the undersigned subscriber(s)
has executed these Articles of Incorporation this 26th day of
FEBRUARY, 2004.

Subscriber, George Coufal

CERTIFICATE DESIGNATING PLACE OF BUSINESS OR DOMICILE FOR THE
SERVICE OF PROCESS WITHIN THIS STATE, NAMING AGENT UPON WHOM
PROCESS MAY BE SERVED:

In pursuant of Section 481.91 and Section
607.034(3), Florida Statutes, the following is submitted in
compliance with said Sections.

UCRC, INC.

desiring to organize under the laws of the State of Florida,

H04000043290

H04000043290

designates as its agent to accept service of process within
this State, FLORIDA, with its agent's office as indicated in
the Certificate of Incorporation, in the City of Sunrise,
located at 3838 North University Drive, 33351.

ACKNOWLEDGMENT: George Coufal

Having been named to accept service of process forth
above-named corporation, at the place designated in this
Certificate, I hereby accept to act in this capacity, and agree
to comply with the provisions of said sections relative to
keeping open said office.

Registered Agent

04 FEB 27  PM 2:44
SECRETARY OF STATE
TALLAHASSEE, FLORIDA
FILED

H04000043290

# APPLICATION FOR REGISTRATION OF FICTITIOUS NAME

DOCUMENT# G04062900302

**Fictitious Name to be Registered:**  UNIVERSAL CHIROPRACTIC

**Mailing Address of Business:**  3838 N UNIVERSITY DRIVE
SUNRISE, FL  33351

**Florida County of principal place of business:**  BROWARD

**FEI Number:**

**FILED**
**Mar 02, 2004**
**Secretary of State**

**Owner(s) of Fictitious Name:**

UCRC INC.
3838 NORTH UNIVESITY DR
SUNRISE, FL  33351    US
Florida Registration Number: P04000038735
FEI Number: 20-0800650

I (we) the undersigned, being the sole (all the) party(ies) owning interest in the above fictitious name, certify that the information indicated on this form is true and accurate.  I (we) understand that the electronic signature(s) below shall have the same legal effect as if made under oath.

GEORGE F COUFAL                                          03/02/2004
Electronic Signature(s)                                    Date

**Certificate of Status Requested (X)          Certified Copy Requested ( )**

Exhibit "2"

## STOCK PURCHASE AGREEMENT

THIS AGREEMENT is made and entered into this 6th day of March, 2008, by and between Kent Bernarduci and Dr. Robert Findlay, ("SELLERS") and Dr. Gary Hoste, DC and Jeffrey Miller, ("PURCHASERS")

WHEREAS, the SELLERS are the record owners and holders of 100% of the outstanding shares of the capital stock of UCRC, Inc., ("Corporation"), a corporation, which Corporation has issued capital stock of 100 shares of $1.00 par value common stock; and

WHEREAS, the PURCHASERS desire to purchase said stock and the SELLERS desire to sell said stock, upon the terms and subject to the conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained in this Agreement, and in order to consummate the purchase and the sale of the Corporation's Stock aforementioned, it is hereby agreed as follows:

1. Purchase and Sale: Subject to the terms and conditions hereinafter set forth, at the closing of the transfer contemplated hereby, the SELLERS shall convey, transfer and deliver to the PURCHASERS certificates representing such stock, and the PURCHASERS shall produce from the SELLERS the Corporation's Stock in consideration of the purchase price et forth in this agreement. The certificates representing the Corporation's stock shall be duly endorsed for transfer or accompanied by appropriate stock transfer powers duly executed in blank, in either case with signatures guaranteed in the customary fashion, and shall have all the necessary documentary transfer tax stamps affixed hereto at the expense of the SELLERS. The closing of the transactions contemplated by this Agreement ("Closing"), shall be held on May 6, 2008, or within 15 days of May 6, 2008 if necessary for financing or AHCA approval at Fort Lauderdale Florida or such other place, date, and time as the parties hereto may otherwise agree.

2. AMOUNT AND PAYMENT OF PURCHASE PRICE: Total consideration and method of payment thereof are fully set out in Exhibit "A" attached hereto and made a part hereof.

3. REPRESENTATIONS AND WARRANTIES OF SELLERS: SELLERS hereby warrant and represent:

    (a) Organization and Standing.
    Corporation is a corporation duly organized, validly existing and in good standing under the laws of the State of Florida and has the corporate power and authority to carry on its business as it is now being conducted.

    (b) Restrictions on Stock.

    i.   The SELLERS are not a party to any agreement, written or oral, creating rights in respect to the corporation's stock in any third person or relating to the voting of the Corporation stock.

    ii.  SELLERS are the lawful owner of the Stock, free and clear of all security interests, leins, encumbrances, equities and other charges.

    iii. There are no existing warrants, options, stock purchase agreements, redemption agreements, restrictions of any nature, calls or rights to subscribe of any character relating to the stock, nor are there any securities convertible to such stock

4. REPRESENTATIONS AND WARRANTIES OF SELLERS AND PURCHASERS. SELLERS AND PURCHASERS hereby represent and warrant that there has been no act or omission by SELLERS, PURCHASERS of the Corporation which would give rise to any valid claim against any of the parties hereto for a brokerage commission, finders fee, or other like payment in connection with the transactions contemplated hereby.

5. GENERAL PROVISIONS

    (a) Entire Agreement. This agreement (including the exhibits hereto and any written amendments hereof executed by the parties) constitutes the entire Agreement and supersedes all prior agreements and understandings, oral or written, between the parties hereto with respect to the subject matter hereof.

(b) Sections and other headings. The section and other headings contained in this agreement are for reference purposes only and shall not affect the meaning or interpretation of this agreement.

(c) Governing Law. This agreement, and all transactions contemplated hereby, shall be governed by, construed and enforced in accordance with the laws of the State of Florida.

6. HOLD HARMLESS. SELLERS agree to hold the PURCHASERS harmless and indemnify, and defend for any debt or legal action arising from events which occurred prior to the time of closing, with the exception of the Toshiba copier which shall remain a debt of the corporation and assumed by the PURCHASERS.

7. FINANCING. The PURCHASERS shall be entitled to a refund of the $10,000.00 good faith deposit, if financing is unable to be obtained at $370,000.00 at prime + 2.75 or better, by buyer or if AHCA approval is not obtained. Sellers to provide certified copies of all financials as needed to procure loan. Seller agrees to cooperate in any reasonable fashion to help secure the financing of the practice.

8. COVENANT NOT TO COMPETE. SELLERS agree that they will not individually or collectively as a member of a partnership, sole proprietorship, corporation, or any other entity or as a consultant, manager, advisor, lender, guarantor or in any other capacity, either directly or indirectly engage in the same or similar business as are presently engaged in by the Seller, nor will seller induce, solicit, or in any other way attempt to induce patients, staff or referral sources to cease doing business with, reduce business with, or reduced services from UCRC, for a term of three (3) years from the date of closing anywhere within Broward County, Florida. Any violation of said agreement will constitute breach and SELLERS AGREE TO PAY a minimum of $5,000.00 per violation and reimburse the PURCHASERS reasonable attorney's fees, court costs, and all other expenses, related to the breach. PURCHASERS specifically exclude the ownership, and/or operation of an MRI or Imaging center within the Broward County Area. Additionally purchasers contemplate future joint marketing, in which under certain circumstances, patient will be given a choice of location, and may choose to travel to a facility owned by the SELLERS, outside of the Broward county area. This would be exempt from the non-compete covenant, and therefore not considered a breach of the non-compete covenant.

9. ASSISTANCE AFTER CLOSING. The Sellers agree to assist the Purchasers in the operation of the business for a period of Ten (10) months following closing as outlined in Exhibit "B".

10. AHCA LICENSE. The seller shall procure a license from the State of Florida (AHCA) for the legal operation of UCRC, Inc. as a chiropractic office at the expense of the purchasers.

Dated this _____6_____ of ___MARCH___, 2008

IN WITNESS WHEREOF, this Agreement has been executed by each of the individual parties hereto on the date first above written.

Sellers:

By: _____
Kent Barnaducci

By: _____
Dr. Robert Findlay

Buyers:

By: _____
Jeffrey Miller

By: _____
Dr. Gary Hoste, DC

# EXHIBIT "A" AMOUNT AND PAYMENT OF PURCHASE PRICE

(a) Consideration. As total consideration for the purchase and sale of the Corporation's Stock, pursuant to this Agreement, the PURCHASERS shall pay to the SELLERS the sum of $475,000.00 such consideration to be referred to in this Agreement as the "Purchase Price".

(b) Payments. The purchase price shall be paid as follows:

   i. The sum of $100,000.00 has been previously paid to SELLERS.
   ii. The sum of $325,000.00 to be delivered to SELLERS AT TIME OF CLOSING.
   iii. The sum of $50,000.00 to be delivered to SELLERS in 10 equal consecutive monthly payments, beginning on the 31st day after closing.

**Breakdown of Purchase Price:**

| | |
|---|---|
| Equipment | $120,000.00 |
| Patient Files | $70,000.00 |
| Account Receivable | $120,000.00 |
| Transition/support/assistance | $105,000.00 |
| Non-compete | $30,000.00 |
| Hold harmless from Sellers | $30,000.00 |

By: _____
Kent Bernaducci

By: _____
Dr. Robert Findlay

Buyers:

By: _____
Jeffrey Miller

By: _____
Dr. Gary Hoste, DC

## EXHIBIT "B" ASSISTANCE AFTER CLOSING

A: SCHEDULING DURING POST CLOSING PERIOD

BOB FINDLAY:

Month 1:     2 Half Days (4 Hrs.) in office
             4 Hours per Week by phone

Month 2-6:   4 Hours per Week by Phone

KENT BERNADUCCI:

Months 1-3:  16 Hours per week external Marketing
             4 Hours per week average in office
             4 Hours per week by Phone
             Appear for Depositions and train Purchasers on Depositions

Months 4-6   8 Hours per week average for external Marketing
             4 Hours per week by Phone

Months 1-12  Appear for and train Purchasers on Depositions, Trials and depositions

By: _____        By: _____
        Kent Bernaducci                       Dr. Robert Findlay

Buyers:

By: _____        By: _____
        Jeffrey Miller                        Dr. Gary Hoste, DC

STOCK PURCHASE AGREEMENT

THIS AGREEMENT is made and entered into this 26th day of April, 2008, by and between Gary Hoste, ("SELLER") and Jeffrey Miller, ("PURCHASER")

WHEREAS, the SELLERS are the record owners and holders of 85% of the outstanding shares of the capital stock of UCRC, Inc., ("Corporation"), a corporation, which Corporation has issued capital stock of 100 shares of $1.00 par value common stock; and

WHEREAS, the PURCHASERS desire to purchase said stock and the SELLERS desire to sell said stock, upon the terms and subject to the conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained in this Agreement, and in order to consummate the purchase and the sale of the Corporation's Stock aforementioned, it is hereby agreed as follows:

1.  Purchase and Sale: Subject to the terms and conditions hereinafter set forth, at the closing of the transfer contemplated hereby, the SELLERS shall convey, transfer and deliver to the PURCHASERS certificates representing 35% of the total UCRC stock, and the PURCHASERS shall produce from the SELLERS the Corporation's Stock in consideration of the purchase price et forth in this agreement. The certificates representing the Corporation's stock shall be duly endorsed for transfer or accompanied by appropriate stock transfer powers duly executed in blank, in either case with signatures guaranteed in the customary fashion, and shall have all the necessary documentary transfer tax stamps affixed hereto at the expense of the SELLERS. The closing of the transactions contemplated by this Agreement ("Closing"), shall be held on May 30, 2008, or within 60 days of May 30, 2008 at the purchasers descrition, at Fort Lauderdale Florida or such other place, date, and time as the parties hereto may otherwise agree.

2.  AMOUNT AND PAYMENT OF PURCHASE PRICE: Total consideration and method of payment thereof is $35.00, in the form of a personal check, or cashier check.

Dated this    30    of    April          , 2008

IN WITNESS WHEREOF, this Agreement has been executed by each of the individual parties hereto on the date first above written.

Seller:

By:    _____
       Dr. Gary Hoste, DC

By:_____
       Jeffrey Miller

# Electronic Articles of Incorporation
# For

P08000062596
FILED
June 30, 2008
Sec. Of State
clewis

UCRC HOLDINGS INC

The undersigned incorporator, for the purpose of forming a Florida
profit corporation, hereby adopts the following Articles of Incorporation:

## Article I

The name of the corporation is:

UCRC HOLDINGS INC

## Article II

The principal place of business address:

3838 N UNIVERSITY DRIVE
SUNRISE, FL. US 33351

The mailing address of the corporation is:

3838 N UNIVERSITY DRIVE
SUNRISE, FL. US 33351

## Article III

The purpose for which this corporation is organized is:

ANY AND ALL LAWFUL BUSINESS.

## Article IV

The number of shares the corporation is authorized to issue is:

5000

## Article V

The name and Florida street address of the registered agent is:

GARY F HOSTE
2501 S OCEAN DRIVE
1029
HOLLYWOOD, FL. 33319

I certify that I am familiar with and accept the responsibilities of registered agent.

P08000062596
FILED
June 30, 2008
Sec. Of State
clewis

Registered Agent Signature:   GARY F HOSTE

# Article VI

The name and address of the incorporator is:

GARY F HOSTE
2501 S OCEAN DRIVE
1029
HOLLYWOOD, FL 33319

Incorporator Signature:   GARY F HOSTE

# Article VII

The initial officer(s) and/or director(s) of the corporation is/are:

Title:   DP
GARY F HOSTE
2501 S OCEAN DRIVE  #1029
HOLLYWOOD, FL.   33319  US

Title:   VS
JEFFERY  MILLER
2501 S OCEAN DRIVE  #1029
HOLLYWOOD, CA.  33319  US

# Article VIII

The effective date for this corporation shall be:

06/28/2008

**P08000062596**

_____
(Requestor's Name)

_____
(Address)

_____
(Address)

_____
(City/State/Zip/Phone #)

☐ PICK-UP   ☐ WAIT   ☐ MAIL

_____
(Business Entity Name)

_____
(Document Number)

Certified Copies ___✓___   Certificates of Status ___✓___

┌─────────────────────────────────────┐
│ Special Instructions to Filing Officer: │
│                                         │
│                                         │
│                                         │
│                                         │
│                                         │
└─────────────────────────────────────┘

Office Use Only



900136288979

10/03/08--01047--012  **52.50

FILED
2008 OCT -3 PM 12: 22
SECRETARY OF STATE
TALLAHASSEE, FLORIDA

Amend

TB   10/10/08

Exhibit "6"

# COVER LETTER

**TO:** Amendment Section
Division of Corporations

**NAME OF CORPORATION:** UCRC Holdings Inc.

**DOCUMENT NUMBER:** P08000062596

The enclosed *Articles of Amendment* and fee are submitted for filing.

Please return all correspondence concerning this matter to the following:

Gary Hoste
(Name of Contact Person)

UCRC Holdings Inc.
(Firm/ Company)

3838 N. University Dr
(Address)

Sunrise Fl 33351
(City/ State and Zip Code)

For further information concerning this matter, please call:

Gary Hoste at (954) 746-2829
(Name of Contact Person)    (Area Code & Daytime Telephone Number)

Enclosed is a check for the following amount:

☐ $35 Filing Fee    ☐ $43.75 Filing Fee &    ☐ $43.75 Filing Fee &    ☒ $52.50 Filing Fee
Certificate of Status    Certified Copy    Certificate of Status
(Additional copy is    Certified Copy
enclosed)    (Additional Copy
is enclosed)

**Mailing Address**    **Street Address**
Amendment Section    Amendment Section
Division of Corporations    Division of Corporations
P.O. Box 6327    Clifton Building
Tallahassee, FL 32314    2661 Executive Center Circle
Tallahassee, FL 32301

Exhibit "6"

**Articles of Amendment**
**to**
**Articles of Incorporation**
**of**

2008 OCT -3 PM 12:22
FILED
SECRETARY OF STATE
TALLAHASSEE, FLORIDA

_UC RC Holdings Inc_

(Name of corporation as currently filed with the Florida Dept. of State)

_P08000062596_

(Document number of corporation (if known))

Pursuant to the provisions of section 607.1006, Florida Statutes, this *Florida Profit Corporation* adopts the following amendment(s) to its Articles of Incorporation:

**NEW CORPORATE NAME (if changing):**

(Must contain the word "corporation," "company," or "incorporated" or the abbreviation "Corp.," "Inc.," or "Co.")
(A professional corporation must contain the word "chartered", "professional association," or the abbreviation "P.A.")

**AMENDMENTS ADOPTED- (OTHER THAN NAME CHANGE)** Indicate Article Number(s) and/or Article Title(s) being amended, added or deleted: (BE SPECIFIC)

ARTICLE The Initial officer and /or director of the corporation is/are Title DP Gary Hoste. 3838 North University Drive Sunrise Florida 33351

(Attach additional pages if necessary)

If an amendment provides for exchange, reclassification, or cancellation of issued shares, provisions for implementing the amendment if not contained in the amendment itself: (if not applicable, indicate N/A)

(continued)

Exhibit "6"

**The date of each amendment(s) adoption:** _09/26/2008_

**Effective date if applicable:** _09/26/2008_
(no more than 90 days after amendment file date)

**Adoption of Amendment(s)**      **(CHECK ONE)**

☒ The amendment(s) was/were approved by the shareholders. The number of votes cast for the amendment(s) by the shareholders was/were sufficient for approval.

☐ The amendment(s) was/were approved by the shareholders through voting groups. *The following statement must be separately provided for each voting group entitled to vote separately on the amendment(s):*

     "The number of votes cast for the amendment(s) was/were sufficient for approval by
_____."
(voting group)

☐ The amendment(s) was/were adopted by the board of directors without shareholder action and shareholder action was not required.

☐ The amendment(s) was/were adopted by the incorporators without shareholder action and shareholder action was not required.

Signature _____
(By a director, president or other officer - if directors or officers have not been selected, by an incorporator - if in the hands of a receiver, trustee, or other court appointed fiduciary by that fiduciary)

_Gary Hoste_____
(Typed or printed name of person signing)

_President_____
(Title of person signing)

**FILING FEE: $35**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

FORT LAUDERDALE DIVISION

CASE NO.:

JEFFREY MILLER, individually,
and derivatively on behalf of Nominal
Defendants UCRC, Inc. and UCRC
Holdings, Inc.,

       Plaintiff,

v.

GARY HOSTE,

       Defendant,

and

UCRC, Inc. and UCRC Holdings,
Inc.,

       Nominal Defendants.

_____/

## **COMPLAINT AND VERIFIED SHAREHOLDER DERIVATIVE PETITION**

## **COMPLAINT**

Plaintiff, JEFFREY MILLER, individually, sues Defendant, GARY HOSTE, and alleges:

1.    Plaintiff JEFFREY MILLER ("Miller) is a resident of the State of California, and is otherwise *sui juris*.

2.    Defendant GARY HOSTE ("Hoste") is a resident of the State of Florida, and is otherwise *sui juris*.

3.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332, as there is complete diversity between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4.     This Court is vested with the authority to grant the declaratory relief sought herein under 28 U.S.C. §2201 (Declaratory Judgment Act).

5.     Venue in this judicial district is proper pursuant to 28 U.S.C. §1391, as Hoste resides in this judicial district and a substantial part of the events or omissions giving rise to the claim occurred in Broward County, Florida.

### **General Allegations Common to All Counts**

6.     Hoste is a licensed chiropractor in the State of Florida.

7.     Miller is a licensed chiropractor in the State of California.

8.     UCRC, Inc. (hereinafter "UCRC") is a Florida corporation that was incorporated on or about February 27, 2004 by George Coufal.  A copy of the Articles of Incorporation of UCRC is attached as Exhibit "1."

9.     UCRC was formed for the purpose of operating a chiropractic center doing business as "Universal Chiropractic," having its principal place of business at 3838 N. University Drive, Sunrise, Florida 33151.  A true and correct copy of the fictitious name registration, dated March 2, 2004, is attached as Exhibit "2."

10.     Miller and Hoste first became acquainted with each other as classmates at Life Chiropractic College West in Hayward, California, in approximately 1994.

11.     Between 1996 and 2005, Hoste worked intermittently for Miller in the chiropractic field.  In approximately 2005 or 2006, Hoste relocated to Florida.

2

12. On or about April 2007, Hoste was working in Florida as a salaried chiropractic physician for UCRC.

13. On or about April 2007, Hoste began to speak about Miller about his desire to acquire UCRC for a purchase price of approximately $400,000. Hoste told Miller at that time that Hoste, together with Satyam Patel ("Patel") who was an investor, were contemplating a purchase of the chiropractic venture from the extant shareholders of UCRC, namely Kent Bernarduci ("Bernarduci") and Robert Findlay ("Findlay").

13. Hoste orally communicated to Miller certain concerns that Hoste had about the contemplated acquisition of UCRC. Amongst Hoste's concerns were that Hoste himself lacked financial capacity either to purchase UCRC or to contribute capital towards the financing of an acquisition of UCRC; that Patel had insufficient knowledge of the chiropractic field; and that Hoste was unsure as to how to structure the transaction.

14. The discussions between Hoste and Miller about Hoste's intended acquisition of UCRC continued for many months. In the beginning of the discussions, it was anticipated by Hoste that Patel would secure a loan to finance the purchase of UCRC.

15. Eventually, Hoste came to understand that Patel, with or without Hoste's assistance, lacked the requisite business acumen and/or financial wherewithal to either purchase UCRC or to secure a loan to finance the acquisition of UCRC. Accordingly, in late summer/early autumn of 2007, Hoste began to ask Miller whether Miller would like to join Hoste as a "50/50 partner" in the purchase of UCRC.

16. In response to Hoste's request, Miller began due diligence to evaluate the risks and benefits of the proposed deal. Throughout the period between August and October, 2007, Miller, together with Hoste, reviewed material UCRC financial data, including, *inter alia*, the

3

UCRC Form 1120S federal tax returns for 2005 and 2006, and traveled to visit the UCRC practice in Sunrise, Florida on multiple occasions.

17.     On or about September 2007, Miller concluded that the investment opportunity in UCRC was attractive.  Accordingly, sometime on or about October, 2007, Miller and Hoste entered into an oral agreement between themselves to jointly purchase the stock of UCRC for the purposes of operating Universal Chiropractic.

18.     Pursuant to the terms of the oral agreement, in consideration for a 50% interest in UCRC, Miller was obligated (1) to arrange for and secure a bank loan to purchase the ongoing practice, (2) to provide whatever money that was necessary as a down payment to secure the loan and consummate the acquisition, (3) to provide whatever additional incidental monies would be required to effectuate the purchase agreement, and (4) to participate in marketing efforts as appropriate to expand the ongoing UCRC business.

19.     Pursuant to the terms of the oral agreement, in consideration for a 50% interest in UCRC, Hoste, as a licensed chiropractor in Florida (which Miller is not), was obligated to operate the practice.

20.     The oral agreement contemplated that both Hoste and Miller, as officers of the corporation, would draw a reasonable salary in consideration for their respective contributions of services performed for UCRC, in conformity with the requirements of Florida statutes.

21.     Throughout the period between October and December 2007, Hoste introduced Miller to the sellers of UCRC and referred to Miller at all times as his "partner" in the acquisition.  At all times material, Hoste represented to the sellers of UCRC that Miller and Hoste would each be equal owners of the to-be-acquired UCRC stock.

4

22.     Throughout the period between October and December 2007, Miller began to negotiate the terms of the acquisition with the UCRC principals. Miller, together with Hoste, reviewed and analyzed proposed terms for the purchase in various redactions.

23.     On or about December 21, 2007, Bernarduci wrote a letter to Hoste and Miller which contained the material terms of an "official offer" relating to the acquisition by Hoste and Miller of UCRC (the "Official Offer").

24.     On or about December 27, 2007, Hoste and Miller wrote a letter of intent ("Letter of Intent") directed to Bernarduci and Findlay outlining an updated understanding of proposed material terms of the acquisition of UCRC by Hoste and Miller.

25.     The Letter of Intent established a purchase price of $475,000 for UCRC.

26.     The Letter of Intent obligated Hoste and Miller as purchasers to make a $10,000 good faith deposit into an escrow account held by sellers' attorney Steven Lander, Esq. ("Lander") within ten (10) business days of the signing of the Letter of Intent. The good faith deposit was designated as refundable if Hoste and Miller failed in their efforts to secure financing to enable the acquisition.

27.     On or about January 26, 2008, Miller tendered the required $10,000 payment into the escrow account held by attorney Lander. The good faith deposit was tendered from Miller's personal accounts.

28.     From December 27, 2007 through June 3, 2008, Miller worked tirelessly with lender CIT Small Business Lending Corporation (hereinafter, "CIT" or "the Lender") to secure the requisite financing for the UCRC acquisition. During this time, Miller participated in negotiating material terms of the loan and performed all tasks necessary to ensure compliance with the Lender's exhaustive check list of conditions precedent to the closing of the loan.

5

During this time, Miller flew from California to Florida approximately once every two weeks to ensure that the CIT loan would come to fruition and to work on business development for UCRC.

29.     On or about March 6, 2008, Hoste and Miller, as the designated "Purchasers," entered into a Stock Purchase Agreement ("UCRC Stock Purchase Agreement") with Bernarduci and Findlay, as Sellers, pursuant to which Sellers agreed to deliver 100% of the outstanding shares of UCRC, Inc. in consideration of a $475,000 purchase price.  A true and correct copy of the UCRC Stock Purchase Agreement is attached as Exhibit "3."

30.     The UCRC Stock Purchase Agreement contemplated a closing date for the loan transaction to occur within fifteen days of May 6, 2008, subject to placement of the CIT loan and licensing from the Florida Agency for Health Care Administration ("AHCA").

31.     By subsequent stipulation of all parties, the closing date for the loan transaction was ultimately extended until June 30, 2008.

32.     On or about March 2008, CIT representative Mark Thompson ("Thompson") orally represented to Hoste and Miller that the loan processing would proceed more smoothly if Hoste were listed on the loan documents as an eighty-five percent (85%) owner of the purchasing entity.  Thompson based this statement on the fact that Hoste's personal credit rating was superior to Miller's.

33.     Accordingly, Hoste and Miller agreed that for purposes of securing the loan, Hoste and Miller would be listed on all loan documents as having 85% and 15% ownership interests, respectively, in UCRC.

34.     Hoste and Miller further agreed with Thompson that Hoste and Miller would be listed as having 85% and 15% ownership interests, respectively, on all licensing applications

6

which Hoste and Miller were in the process of preparing for the Florida Agency on Health Care Administration ("AHCA").

35. It was understood between and among Hoste, Miller and Thompson that Hoste and Miller would enter into a Stock Purchase Agreement for the purpose of restoring the intended equal partnership interests (Hoste 50%; Miller 50%) in UCRC, to become effective upon the acquisition of UCRC. It was further understood between and among Hoste, Miller and Thompson, that CIT assented to such an executory share transfer, creating an equal ownership interest between Hoste and Miller. Moreover, the express terms of the AHCA license application allowed for a transfer of up to 35% of the shares without the need to refile the AHCA license application.

36. On or about April 26, 2008, Hoste and Miller entered into a Stock Purchase Agreement (the "Hoste Stock Purchase Agreement"), pursuant to which Hoste committed to transfer thirty-five shares of capital stock of UCRC, Inc., representing thirty-five percent (35%) of the company's outstanding shares, to Miller, such transfer to occur at the closing of Hoste's and Miller's acquisition of UCRC. A true and correct copy of the Hoste Stock Purchase Agreement is attached as Exhibit "4."

37. On or about June 27, 2008 CIT representative Kathy Forbes-Hunter sent an e-mail to Hoste and Miller notifying them that the Small Business Administration requires that when two unrelated individuals purchase the stock of a corporation, the individuals must form a new entity to hold title to the shares of the corporation.

38. In compliant response to the e-mail notice of Kathy Forbes-Hunter of the SBA requirement, on June 30, 2008, Hoste and Miller formed UCRC Holdings, Inc. ("UCRC Holdings"), a Florida Corporation. The Articles of Incorporation designated Hoste as President

7

and Director of the corporation; the Articles of Incorporation designated Miller as Vice-President and Secretary of the corporation. *See* Exhibit 5.

39.     The acquisition of UCRC by UCRC Holdings was consummated along with the closing of the loan on or about June 30, 2008 (the "Closing Date"). The transfer of stock certificates from the sellers of UCRC to Hoste and Miller, each as 50% owners of UCRC Holdings, occurred contemporaneously on the Closing Date.

40.     Since the Closing Date, Hoste has at all times maintained exclusive possession, custody and control over all of the corporate documents of UCRC and UCRC Holdings. Upon information and belief, the corporate documents contain, *inter alia*, the stock certificates reflecting the ownership of UCRC by UCRC Holdings (or, alternatively, Hoste and Miller), as such duly executed certificate[s] are required by UCRC's Corporate Bylaws.

41.     On the Closing Date, it was understood by Hoste, Miller, the sellers of UCRC stock and all agents or employees of CIT involved with the loan transaction, that Hoste and Miller each would be a director of UCRC and UCRC Holdings and that each would participate actively and equally in the management and decision-making involved in operating the corporation. It was, further, the understanding and intention of all the parties that, corporate resources permitting, each would receive distributions from UCRC in equal amounts as long as each assumed an active and ongoing responsibility for carrying a portion of the burdens necessary to operate the business.

42.     Between December 27, 2007 through June 3, 2008, in the presence of Miller, Hoste at all times represented that Miller was Hoste's "partner" and that Miller was to be a 50% owner/partner of UCRC upon the completion of the acquisition. Among the persons to whom Hoste represented that Miller was Hoste's full partner and a prospective 50% owner of UCRC

8

were the following: Bernarduci; Findlay; Patel; Thompson, Lander; Bob Hovenan (UCRC's accountant); Dr. Stuart Sherman (Hoste's friend); William Chacon (Hoste's friend); and Donald Rosen (deputy mayor of Sunrise, Florida).

43. Approximately one week after the Closing Date, Bob Hovenan, certified public accountant for UCRC and UCRC Holdings, requested that Hoste and Miller each sign and submit Internal Revenue Service forms (such as a Form 2553 election to be taxed under Subchapter S of Chapter 1 of the Internal Revenue Code).indicating that Hoste and Miller each had a 50% ownership interest in UCRC Holdings. Copies of the subject IRS documents have been at all times material within the exclusive possession, custody, and control of Hoste.

44. On or about August 2008, Hoste and Miller had a business development meeting with attorneys and other personnel from the Hollywood, Florida law firm of Dell & Schaefer, P.A. in an attempt to market their chiropractic services. At the meeting, Hoste and Miller were seeking a commitment from the attorneys to refer their personal injury clients to UCRC for treatment. At the meeting with Dell & Schaeffer, Hoste at all times represented that Miller and Hoste each had a fifty percent (50%) ownership interest in UCRC and/or UCRC Holdings.

45. Between December 2007 August 2008, in multiple conversations, Hoste told his friend Dr. Stuart Sherman that Hoste needed Miller to complete the deal for UCRC because Hoste lacked Miller's experience, marketing savvy, and knowledge to operate a chiropractic business. Further, Hoste confided in Sherman that Hoste had no money and was thus unable to afford to purchase UCRC by himself. Hoste specifically represented to Sherman that in consideration for Miller's services and cash contributions, Miller was going to become, and in fact did become, a 50% owner of UCRC and UCRC Holdings.

9

46.     Between December 2007 and May 2008, Hoste and Miller met with Don Rosen, the deputy mayor of Sunrise, Florida, for the purpose of discussions relating to the "lay of the land" in developing a chiropractic practice within the municipality. Hoste and Miller discussed with Rosen various logistics relating to corporate marketing, regulatory requirements, and participation in the municipal insurance plan. At the meeting with Mr. Rosen, Hoste specifically represented that Hoste and Miller were "equal partners" in the chiropractic venture.

47.     Between October 2007 and August 2008, Miller contributed cash, property, and the aforedescribed services in consideration for a fifty percent (50%) ownership interest in UCRC and UCRC Holdings, and in reliance upon Hoste's representations that Miller would be an equal equity partner in UCRC and UCRC Holdings.

48.     Specifically, Miller contributed cash of Twenty Thousand One Hundred Forty-Two and 25/100 ($20,142.25), as follows:  Eight Thousand Dollars ($8,000) on or about the Closing Date to consummate UCRC Holdings' acquisition of UCRC through the loan secured with CIT; Ten Thousand Dollars ($10,000) deposit on or about January 26, 2008 into an escrow account held by attorney Stephen Lander for the benefit of the UCRC Sellers; Two Thousand Forty-Two and 25/100 Dollars ($2,042.25) for fees to AHCA, including fingerprinting, on or about March 3, 2008; $100 for purchase of shares of UCRC Holdings common stock from Hoste, on or about June 30, 2008.

49.     Specifically, Miller contributed property as follows:  two (2) computers; 1 external hard drive; 1 briefcase; 2 suitcases; office furniture; a full wardrobe; and personal effects, of an aggregate approximate value of Eighteen Thousand Dollars ($18,000).

50.     In addition, between December 2007 and August 2008, Miller incurred travel expenses of approximately Four Thousand Six Hundred Dollars ($4,600) and miscellaneous

10

other business expenses which were advanced personally by Miller on behalf of UCRC (and/or UCRC Holdings) in an approximate aggregate amount of Four Thousand Two Hundred Dollars ($4,200). It was expressly agreed between Hoste and Miller that the travel and business expenses incurred by Miller were to be reimbursed by UCRC.

51.     Beginning in late August or early September 2008, shortly after the UCRC acquisition by Hoste and Miller, Hoste inexplicably began to avoid communications initiated by Miller, including notices provided by Miller that he was canceling various marketing events in view of Hoste's silence, and including requests made by Miller as a shareholder of UCRC and UCRC Holdings for access to corporate documents, including access to the corporate books and records.

52.     In view of Hoste's evasive conduct, Miller feared a squeeze-out by Hoste and duly noticed an October 14, 2008 special meeting of the officers and directors of UCRC Holdings at which Miller intended to address the potential issues of squeeze-out and oppressive conduct by Hoste by acting as a controlling shareholder without controlling authority as a fifty per cent (50%) shareholder.

53.     Hoste ignored the notice of the special meeting of the officers and directors of UCRC Holdings and did not appear at the special meeting on October 14, 2008.

54.     Unbeknownst to Miller at the time that he noticed the October 14, 2008 special meeting, Hoste had already taken unilateral action to amend the Articles of Incorporation of UCRC Holdings on October 3, 2008, to reflect that Hoste was the sole initial officer and/or director of the corporation. A true and correct copy of the Articles of Amendment to Articles of Incorporation of UCRC Holdings (the "Articles of Amendment") is attached as Exhibit "6."

11

55. The Articles of Amendment to the UCRC Holdings Articles of Incorporation further represented that the adopted amendment, which effectively squeezed out Miller as an officer and director of UCRC Holdings, was approved by a majority vote of the shareholders, which representation was signed by Hoste.

56. By signing the Articles of Amendment, Hoste has intentionally misrepresented that corporate action had been duly taken by a sufficient number of shareholder votes when in fact Hoste had knowledge that no such shareholder vote ever took place.

57. By signing the Articles of Amendment and intentionally misrepresenting that corporate action was duly taken when it was not, Hoste has acted unlawfully in violation of Florida statutes, and with malice and oppression, in willful disregard to the rights of Miller as an investor, shareholder, and director of UCRC Holdings and UCRC.

58. By signing the Articles of Amendment and intentionally misrepresenting that corporate action was duly taken when it was not, Hoste has violated the express terms of the loan with CIT which require that any change of ownership only be made with the Lender's consent.

59. Upon information and belief, since Hoste began to operate UCRC, Hoste has been drawing a salary in excess of the salary which was agreed to by Hoste and Miller and in excess of a reasonable salary commensurate with the reasonable salary of a chiropractic physician of similar skill and experience practicing in a similar locality.

60. Upon information and belief, since Hoste began to operate UCRC, Hoste has been diverting corporate revenues for his own personal financial benefit by creating disbursement ledger entries for purported corporate expenditures which lack documentary support.

61. Upon information and belief, since Hoste began to operate UCRC, Hoste has been taking advantage of corporate opportunities for his personal financial aggrandizement and has

12

been preferentially paying distributions to himself at the expense of other shareholders, and in wanton and reckless disregard for the rights of Miller, who has an equal equity interest in corporate distributions.

62.     The aforestated acts of Hoste were wrongful and committed for the purpose and effect of diminishing the value of Miller's interest in UCRC and UCRC Holdings relative to Hoste's interest in these corporations.

63.     As a direct and foreseeable result of Hoste's self-dealing, commingling, mismanagement, and fraudulent misrepresentation and concealment, Miller's equity interest in UCRC and UCRC Holdings has been seriously jeopardized and damaged.

64.     Miller has demanded that Hoste allow Miller to conduct a full and open audit of operations of UCRC. In response, Hoste has expressly refused to cooperate to permit such an audit. Miller has further requested that Bob Hovenan, Certified Public Accountant, provide Miller with access to corporate tax records of UCRC and UCRC, Inc., and Hovenan has indicated that he has been instructed by Hoste not to provide Miller with access to those records.

65.     To date, Miller has never been provided with any corporate tax returns for UCRC and UCRC Holdings, nor has he been provided with any Schedule K-1 or other reflection of his distributive share of partnership income/deductions.

### FIRST CAUSE OF ACTION
### (Declaratory Relief)

66.     Miller realleges paragraphs 1 through 65, inclusive, as Paragraph 66 of Count I.

67.     This is an action for a declaratory relief pursuant to 28 U.S.C. §2201.

68.     Miller requests that this Court declare his rights and other legal relations between him and Hoste in view of the facts as alleged above. In particular, Miller requests that this Court

declare that Hoste's willful misconduct by intentionally misrepresenting to the Florida Secretary of State that UCRC Holdings' Articles of Incorporation were amended to exclude Miller as an Officer and Director constitutes an improper squeeze-out of Miller as an officer and director of UCRC Holdings.

69.    Miller further requests that this Court declare that in view of all of the facts and circumstances, that Miller has a vested interest as a fifty per cent (50%) shareholder of UCRC and UCRC Holdings, with a commensurate right to fifty percent (50%) of profits and distributions of these two corporations.

70.    Miller further requests that this Court declare that Hoste has improperly and unlawfully acted as a controlling shareholder when he was not, and is so doing has unlawfully usurped his corporate authority to the detriment of Miller.

71.    The declarations sought herein concerns a present justiciable controversy as to a state of facts, and Miller has an actual, present, and adverse interest in the subject matter, either in fact or law.

72.    The antagonistic interests are all before this Court by proper process.

73.    The relief sought herein is neither for the purpose of giving of legal advice by the Court nor for the purpose of seeking answers to questions propounded by curiosity.

**WHEREFORE,** Miller respectfully requests that this Court enter judgment in his favor against Hoste, as set forth below.

## SECOND CAUSE OF ACTION
### (Equitable Accounting)

74.    Miller realleges paragraphs 1 through 65, inclusive, as Paragraph 74 of Count II.

75.    Being entrusted with the sole and exclusive custody of UCRC's books and

14

records and with all books and records detailing the operational history of UCRC since the Closing Date, Hoste is obligated to correctly account to each shareholder for the operations of UCRC.

76. Hoste has refused to honor Miller's repeated demands for access to the operational accounts and for a full accounting of the operations of UCRC.

77. The amount of money due from Hoste to Miller is unknown to Miller and cannot be completely and accurately ascertained without an accounting of all the financial transactions of UCRC since the Closing Date.

78. Miller has no adequate remedy at law.

79. Miller is entitled to an equitable accounting of the operations of UCRC and UCRC Holdings since the Closing Date.

**WHEREFORE,** Miller respectfully requests that this Court enter judgment in his favor against Hoste, as set forth below.

### THIRD CAUSE OF ACTION
#### (Conversion)

80. Miller realleges paragraphs 1 through 65, inclusive, as Paragraph 80 of Count III.

81. Hoste has intentionally and wrongfully diverted Miller's property interest in shares of UCRC and UCRC Holdings common stock, as well as Miller's concomitant property interest in UCRC's profits and the benefits of such profits to Hoste's own personal accounts.

82. Hoste has further intentionally diverted certain capital investments in UCRC and/or UCRC Holdings made by Miller of personal property, consisting of office equipment and furniture, to Hoste's personal accounts.

15

83.     Such profits and capital investment are properly the property of Miller and Miller has an immediate right to a possessory interest in the property.

84.     Hoste's conduct in diverting and exerting unauthorized dominion over Miller's property constitutes conversion without privilege and in bad faith.

85.     As a result of Hoste's conduct, Miller has been damaged in an amount to be determined by the trier of fact, together with prejudgment interest.

86.     Miller has demanded the return of his personal property, which demand was refused and rejected.

**WHEREFORE,** Miller respectfully requests that this Court enter judgment in his favor against Hoste, as set forth below.

**COUNT IV**
**Civil Theft**

**Cause of Action Under Fla. Stat. §§ 772.11 and 812.035**
**for Violation of Fla. Stat. §812.014**

87.     Miller realleges paragraphs 1 through 65, inclusive, as Paragraph 87 of Count IV.

88.     Hoste knowingly and willfully obtained money and property belonging to Miller with the specific criminal intent to deprive Miller, either temporarily or permanently, of the money or the beneficial ownership of fifty per cent (50%) of the shares of common stock of UCRC and UCRC Holdings, which were supposed to be issued to Miller, in the case of UCRC Holdings, and to be transferred to Miller, in the case of UCRC, and which indeed were issued and transferred to Miller as of the Closing Date, in consideration for Miller's investment of cash, property and services performed for UCRC and UCRC Holdings, as more particularly set forth above, in violation of Fla. Stat. §812.014.

89.     As a result, Miller has been injured and has lost the value of his money, personal

16

property and property interest in the value of his UCRC common stock and UCRC Holdings common stock, plus interest from the date of such deprivation.

90.     More than thirty (30) days prior to the filing of this action, Miller made written demand on Hoste for three times the value of the property subject to civil theft, and Hoste has failed and refused to satisfy the demand or to return any of Miller's money or property.

91.     Based on the foregoing, Miller is entitled to reasonable attorney's fees pursuant to Fla. Stat. §§ 772.11 and 772.185, as amended.

92.     Moreover, Miller is entitled to the remedies provided by Fla. Stat. §§ 812.035 and 772.11.

**WHEREFORE,** Miller respectfully requests that this Court enter judgment in his favor against Hoste, as set forth below.

### COUNT V
### Unjust Enrichment

93.     Miller realleges paragraphs 1 through 65, inclusive, as Paragraph 93 of Count V.

94.     Through his contributions of cash, capital equipment and tireless dedication of services performed on behalf of UCRC and UCRC Holdings between October 2007 and September 2008, Miller has conferred a benefit on Hoste, who at all times material has had knowledge of the benefit.

95.     Hoste has voluntarily accepted and retained the benefit conferred by Miller.

96.     Under the facts and circumstances that have been alleged with particularity in this Complaint, it would be inequitable for Hoste to retain the benefits conferred by Miller without paying for the benefits.

17

**WHEREFORE,** Miller respectfully requests that this Court enter judgment in his favor against Hoste, as set forth below.

**COUNT VI**
**Alternative Common Law Fraud**

97.     Miller realleges paragraphs 1 through 65, inclusive, as Paragraph 97 of Count VI.

98.     At all times material, Hoste has represented that Miller would be an equal equity partner in UCRC and UCRC Holdings as more fully alleged with specificity, *supra*.

99.     The representations made by Hoste were knowingly false at the time that the representations were made.

100.     Hoste knowingly and maliciously made the representations for the purpose of inducing Miller to secure a loan and to provide cash, personal property and services to enable himself (through UCRC Holdings, ultimately) to finance the acquisition of UCRC.

101.     In justifiable reliance on the representations that he would be an equal equity partner of UCRC and UCRC Holdings, Miller in fact was induced to contribute, and did contribute, cash, personal property and services which were utilized for the purpose of acquiring UCRC by Hoste and Miller.

102.     But for the contributions of Miller, the consummation of the acquisition of UCRC by Hoste and Miller (through UCRC Holdings, ultimately) would never have occurred.

103.     As a result of the actions taken by Miller in reliance on Hoste's misrepresentations, Miller has suffered damages in the form of loss of cash and personal property, loss of revenues from an ongoing business as a direct and foreseeable result of the time expended assisting Hoste in the acquisition of UCRC, and loss of benefit of the bargain upon which Miller relied.

18

**WHEREFORE,** Miller respectfully requests that this Court enter judgment in his favor against Hoste, as set forth below.

## VERIFIED SHAREHOLDER DERIVATIVE PETITION

Plaintiff, Jeffrey Miller, by and through undersigned counsel, files this Verified Shareholder Derivative Petition against Defendant Gary Hoste, and alleges:

104.    Miller realleges Paragraphs 1 through 65, inclusive, as Paragraph 104.

105.    This is a shareholder derivative action brought by Plaintiff for the benefit of Nominal Defendants UCRC, Inc. and UCRC HOLDINGS, Inc.

106.    Other than Hoste, Miller is the sole putative shareholder of UCRC.    As such, Miller will fairly and adequately represent the interests of UCRC and its shareholders in enforcing the rights of UCRC.

107.    Other than Hoste, Miller is the sole putative shareholder of UCRC Holdings. As such, Miller will fairly and adequately represent the interests of UCRC Holdings and its shareholders in enforcing the rights of UCRC Holdings.

108.    At all times material, Miller was a shareholder in fact of UCRC or Miller's shareholder interest later devolved on him by operation of law.

109.    At all times material, Miller was a shareholder in fact of UCRC Holdings or Miller's shareholder interest later devolved on him by operation of law.

110.    This action is not brought as a collusive action to confer jurisdiction that this Court would otherwise lack.

111.    Hoste currently purports to be the sole shareholder of UCRC and in fact is acting in the capacity of UCRC's controlling shareholder.   Hoste has attained control of UCRC through fraud or, in the alternative, oppression or unlawful squeeze out of Miller as a 50%

19

stockholder, through Hoste's intentional misrepresentation that Miller is either not a shareholder of UCRC or was removed as a shareholder by a vote of the majority shares of UCRC common stock.  As such, the controlling shareholders of UCRC have interests which are in this lawsuit.

112.    Hoste currently purports to be the sole shareholder of UCRC Holdings and in fact is acting in the capacity of UCRC Holding's controlling shareholder.  Hoste has attained control of UCRC Holdings through fraud or, in the alternative, through oppression or unlawful squeeze out of Miller as a 50% stockholder, through Hoste's intentional misrepresentation that Miller is either not a shareholder of UCRC or was removed as a shareholder by a vote of the majority shares of UCRC Holdings' common stock.  As such, the controlling shareholders of UCRC Holdings have interests which are antagonistic to Miller and UCRC Holdings is thus properly aligned as a defendant, together with Hoste, in this lawsuit.

113.    Miller has not made any effort to seek remediation of Hoste's breaches of fiduciary duties to the shareholders of UCRC from the directors of UCRC.  In view of the fact that Hoste acts with self-designated authority as the "sole director" of UCRC, which self-appointment has occurred unlawfully and with malice and oppression towards Miller, any effort by Miller to obtain desired action from the directors of UCRC (Hoste) would be futile.

114.    On or about October 8, 2008, Miller noticed a meeting of the officers and directors of UCRC Holdings for the purpose of asking the corporation to address Hoste's breaches of fiduciary duties to UCRC Holdings' shareholders, which breaches are more fully set forth below.

115.    Hoste ignored the notice of the meeting of the officers and directors.

## COUNT VII

20

## (Breach of Fiduciary Duty/UCRC)

116.   Miller realleges paragraphs 1 through 65 and 105 through 115, inclusive, as Paragraph 116 of Count VII.

117.   As the president and shareholder of UCRC, which is a close corporation, Hoste owes a fiduciary duty to other shareholders, including Miller. <u>Tillis v. United Parts, Inc.</u>, 395 So. 2d 618 (Fla. 5th DCA 1981).

118.   As a director of UCRC, Hoste owes a fiduciary duty to the corporation and its shareholders to discharge his duties:  (a) in good faith; (b) with the care an ordinarily prudent person in a like position would exercise under similar circumstances; and (c) in a manner he reasonably believes to be in the best interests of the corporation.

119.   Miller placed trust in Hoste and Hoste accepted that trust.

120.   Further, Hoste's fiduciary duty to Miller arises out of Hoste's status as sole operator of UCRC, with exclusive dominion over the financial data and reporting

121.   Hoste has engaged in self-dealing and breached his fiduciary duty owed to Miller as a shareholder of UCRC by:

a.   compensating himself excessively and making preferential illicit distributions to himself, which also constitutes corporate waste pursuant to Fla. Stat. §607.07401;

b.   failing to disclose all material information, including the corporate records and financial information relating to the operations of UCRC;

c.   exceeding the scope of his authority by instructing CPA Bob Hovenan to deny Miller, a 50% shareholder, access to financial information relating to the operations of UCRC;

21

        d.      squeezing out Miller from the operations and enjoyment of the enterprise without consideration;

        e.      converting Miller's personal property interest in UCRC, for his own personal benefit and thus depriving Miller of his direct, indirect, derivative or residual interest in UCRC's book of business and/or its benefits.

        f.      refusing to pay Miller (the other shareholder) while making preferential distribution to himself;

        g.      diverting or misappropriating revenues from the operations of UCRC solely for his personal benefit.

        h.      usurping corporate opportunities; and

        i.      wasting corporate assets by failing to take advantage of Miller's special expertise as a developer of corporate markets.

122. In doing so, Hoste acted purposefully, maliciously, and with wanton or reckless disregard for the rights and interests of UCRC and Miller as a shareholder of UCRC, in derogation of his fiduciary duties.

123. As there was no legitimate business purpose for Hoste's actions, Hoste's actions constitute breaches of Hoste's fiduciaries duties owed as a director of UCRC not to use his control as an advantage over other stockholders.

124. As a direct and proximate result of Hoste's breaches of his fiduciary duties, Miller has suffered damages in an amount to be proven at trial.

**WHEREFORE,** Miller prays for judgment against Hoste, as set forth below.

## COUNT VIII
### (Breach of Fiduciary Duty/UCRC Holdings)

22

125.     Miller realleges paragraphs 1 through 65, and 105 through 115, inclusive, as Paragraph 122 of Count VIII.

126.     As a shareholder of UCRC Holdings,which is a close corporation, Hoste owes a fiduciary duty to other shareholders, including Miller. Tillis v. United Parts, Inc., 395 So. 2d 618 (Fla. 5th DCA 1981).

127.     As a director of UCRC Holdings, Hoste owes a fiduciary duty to the corporation and its shareholders to discharge his duties:  (a) in good faith; (b) with the care an ordinarily prudent person in a like position would exercise under similar circumstances; and (c) in a manner he e reasonably believes to be in the best interests of the corporation.

128.     Miller placed trust in Hoste and Hoste accepted that trust.

129.     Further, Hoste's fiduciary duty to Miller arises out of Hoste's status as sole operator of UCRC Holdings, with exclusive dominion over the financial data and reporting

130.     Hoste has engaged in self-dealing and breached his fiduciary duty owed to Miller as a shareholder of UCRC Holdings by:

  a.     compensating himself excessively and making preferential illicit distributions to himself, which also constitutes corporate waste pursuant to Fla. Stat. §607.07401;

  b.     failing to disclose all material information, including the corporate books and records and financial information relating to the operations of UCRC Holdings;

  c.     squeezing out Miller from the operations and enjoyment of the enterprise without consideration;

  d.     making a material misrepresentation to the Florida Secretary of State that a majority vote was taken at a shareholder meeting  to oust Miller as an officer and director of UCRC Holdings, when in fact no such meeting was held and no such majority vote was taken;

23

e.  converting Miller's personal property interest in UCRC Holdings for his own personal benefit and thus depriving Miller of his direct, indirect, derivative or residual interest in UCRC Holdings' book of business and/or its benefits.

f.  refusing to pay Miller (the other shareholder) while making preferential distribution to himself;

g.  diverting or misappropriating revenues from the operations of UCRC Holdings solely for his personal benefit; and

h.  usurping corporate opportunities.

131.  In doing so, Hoste acted purposefully, maliciously, and with wanton or reckless disregard for the rights and interests of UCRC Holdings and Miller as a shareholder of UCRC Holdings, in derogation of his fiduciary duties.

132.  As there was no legitimate business purpose for Hoste's actions, Hoste's actions further constituted a breach of Hoste's fiduciaries duties owed as a director of UCRC Holdings not to use his control as an advantage over other stockholders.

133.  As a direct and proximate result of Hoste's breaches of his fiduciary duties, Miller has suffered damages in an amount to be proven at trial.

**WHEREFORE,** Miller prays for judgment against Hoste, as set forth below.

## PRAYER FOR RELIEF

Miller prays that this Court enter judgment in his favor, as follows:

A.  As declaratory relief, declaring that Miller has a vested fifty percent (50%) equity interest in UCRC and/or UCRC Holdings with a comcomitant entitlement to an equal share of corporate profits and distributions;

24

B.      Ordering an equitable accounting of all earnings, profits and other benefits arising from the operations of UCRC and/or UCRC Holdings since the Closing Date;

C.      Awarding Miller compensatory and punitive damages for Hoste's conversion;

D.      Awarding Miller damages for civil theft pursuant to Fla. Stat. §772.11 in an amount to be determined at trial, to represent the trebling of the current value of the equity position in UCRC and UCRC Holdings of which Miller has been wrongfully deprived by Hoste, together with statutory interest, costs and attorney's fees. Further, Miller requests that this Court order that Hoste divest himself of that portion of his interest in UCRC and UCRC Holdings, Inc which has been wrongfully taken from Miller, pursuant to Fla. Stat. §812.035.

E.      Disgorging corporate profits and distributions which Hoste has personally attained through unjust enrichment;

F.      Awarding Miller compensatory and punitive damages for fraud, including lost profits;

G.      For director and controlling shareholder Hoste's breaches of fiduciary duty to UCRC and UCRC Holdings shareholders,

1.      Awarding UCRC and UCRC Holdings the amount of damages sustained by the respective corporations as a result of Hoste's breaches of fiduciary duties, abuse of control, waste of corporate assets and unjust enrichment, including restitution to UCRC and UCRC Holdings shareholders from the individual Defendant Hoste, and ordering disgorgement of all profits, benefits, and other compensation obtained by Hoste;

2.      Awarding Miller, as the sole shareholder of UCRC and UCRC Holdings other than Hoste, compensatory and punitive damages sustained as a result of Hoste's breaches of fiduciary duties, abuse of control, waste of corporate assets and unjust enrichment;

25

3. Awarding extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions, including attaching, impounding, imposing a constructive trust on or otherwise restricting Hoste's assets which have been obtained from his improper and/or unlawful activities so as to ensure that Miller, on behalf of shareholders of UCRC and UCRC Holdings has an effective remedy;

H. Awarding Miller, both individually and on behalf of shareholders of UCRC and UCRC Holdings, reasonable attorney's fees and the costs of this action; and

I. Awarding Miller, both individually and on behalf of shareholders of UCRC and UCRC Holdings, such other and further relief as may be just, proper and equitable.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

HOWARD J. LEVINE, ESQ.
Law Offices of Howard Levine
1560 Lenox Avenue
Suite 307
Miami Beach, FL 33139
Tel:    (305) 534-0403
Fax:    (305) 672-4127
Fla. Bar No. 0075670
HLevineEsq@aol.com

26

## VERIFICATION

I, JEFFREY Miller, declare that I have reviewed the Complaint and Shareholder Derivative Petition prepared on behalf of UCRC, Inc. and UCRC Holdings, Inc and I authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and his investigation and for that reason believe them to be true. I further declare that I am a bona fide holder for value of common stock of UCRC, Inc. and UCRC Holdings, Inc. The corporate records of UCRC, Inc. and UCRC Holdings, Inc. reflect, to the best of my knowledge, or reasonably should reflect, my ownership interest in these entities. I believe that such corporate records are in the sole possession, custody and control of either Gary Hoste or the corporate accountant[s] or corporate attorney[s] for the Nominal Defendants, who has denied my access to such corporate records. If, for any reason, the corporate records are inconsistent with this declaration, I further declare that any contrary record evidence which may indicate that I was never a holder of common stock in UCRC, Inc. or UCRC Holdings, Inc. is the result of fraudulent conduct by Gary Hoste,

Dated: June 2ND 2011

_____
Jeffrey Miller

STATE OF CALIFORNIA )
COUNTY OF Contra Costa )

BEFORE ME personally appeared Jeffrey Miller, who after first being duly sworn, has attested to the truth of the foregoing Verification.

_____
NOTARY PUBLIC
State of California

My commission expires: APRIL 23RD 2013

MUKESH P. PATEL
COMM. # 1842122
NOTARY PUBLIC-CALIFORNIA
CONTRA COSTA COUNTY
My Comm. Exp. Apr. 23, 2013

Exhibit "7"

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

## Case No. 11-61946-CIV-ROSENBAUM/SELTZER

JEFFREY MILLER, individually and
derivatively on behalf of Nominal
Defendants UCRC, Inc., and
UCRC Holdings, Inc.,

                Plaintiff,

v.

GARY HOSTE and Nominal Defendants
UCRC, Inc., and UCRC Holdings, Inc.,

                Defendants.

_____/

## <u>ORDER ON PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

This matter is before the Court on Plaintiff Jeffrey Miller's Motion for Partial Summary Judgment [D.E. 88]. The Court has carefully reviewed Plaintiff's Motion, all supporting and opposing filings, and the entire record. For the reasons set forth below, the Court now grants Plaintiff's Motion in part and denies it in part with respect to Count I and denies it with regard to Counts VII and VIII.

### *I. Background*

This lawsuit arises out of a dispute between Plaintiff Jeffrey Miller and Defendant Gary Hoste over the purchase and ownership of a chiropractic practice called UCRC, Inc. ("UCRC"). Originally, it appears that Miller and Hoste made an oral agreement to purchase UCRC together. Although the parties dispute whether this occurred, and, if so, what, if any percentages of ownership were agreed to, eventually, the parties represented Hoste to be the intended 85% owner with Miller

as the intended 15% owner, in documents filed to obtain financing for the deal. Nevertheless, Hoste and Miller separately entered into a written agreement providing Miller with the opportunity to buy another 35% of UCRC's shares in exchange for $35.00 just after the sale of UCRC to Miller and Hoste, so Miller and Hoste would each own 50% again.

Just over three months after the sale of UCRC occurred, Hoste amended the articles of incorporation of UCRC's holding entity to reflect that Hoste was the sole owner of the company. Based on this series of events, Miller seeks a declaratory judgment, among other remedies, declaring him to be the owner of 50% of UCRC. For his part, Hoste disputes that Miller ever fulfilled his obligations under the original oral agreement to split ownership, so he is not entitled to any shares of UCRC. And, even Miller satisfied his obligations under the original agreement, Hoste argues, Miller never paid the $35.00 for the 35% of the shares. Therefore, Hoste insists, Miller is not entitled to any of the relief he seeks.

## *II. Material Facts*[1]

### A. Background

1. Jeffrey Miller was first licensed as a chiropractor in Massachusetts in 1997. Shortly thereafter, he was licensed in California. Since 1997, Miller has practiced as a chiropractor in California, where he worked both as an employee in medical clinics and as a self-employed operator of his own chiropractic clinics.

---

[1]The Court has set forth the material facts based on its review of Plaintiff's Statement of Material Facts [D.E. 90], Defendant's Response to that Statement [D.E. 98], Plaintiff's Reply to Defendant's Response to the Statement of Material Facts [D.E. 102], and the exhibits filed in the record. In accordance with Local Rule 7.5(d), all material facts set forth in Plaintiff's Statement and supported by evidence of record are deemed admitted unless controverted by Defendant's Response. Also, where no controversy exists over a proposed statement of material fact, the Court does not include citations.

Exhibit "8"

2.  Gary Hoste was first licensed as a chiropractor in Hawaii in approximately 2000.  About a year and a half later, Hoste was licensed in California.  Hoste has held a chiropractic license in Florida since about June 2007.

3.  Hoste assisted Miller with the marketing of some of Miller's early practices.  In approximately 1997, Hoste also worked for a year to a year and a half as an employee of Miller, providing chiropractic assistance at Holistic Health Center in California.  Beginning in 2001, after Hoste returned to California from Hawaii, Hoste worked for four-and-a-half years as an employee for Redwood Rehab, which was partially owned by Miller until he sold his interest in 2005 or 2006.  Despite the sale, Miller continued to provide chiropractic care to patients at the successor in interest to Redwood Rehab until some time between the end of 2007 and 2009.

4.  Hoste went to Florida in July 2007 to obtain his chiropractic license and explore what he thought would be better chiropractic markets.

### B.  The Acquisition of UCRC

5.  Another individual (UCRC's "Operator") hired Hoste to work as a full-time salaried employee for UCRC in August 2007.  Hoste mistakenly believed upon his hiring that the Operator owned UCRC.

6.  As it turned out, as of July 2, 2007, the Operator had, in fact, made an offer to purchase UCRC from the existing shareholders, Robert Findlay, D.C., and Kent Bernarduci.  The UCRC minutes of July 2, 2007, reflect that UCRC agreed to continue to proceed with the Operator's offer to buy UCRC, pending approval of Florida's Agency for Health Care Administration ("AHCA") and the Chiropractor's Lender, despite concern that Dr. Findlay expressed about the Operator's limited business and industry experience.  At that meeting, Dr. Findlay suggested a possible management

-3-

Exhibit "8"

contract with the Operator, with supervision by Findlay and Bernarduci.

7.   The UCRC minutes of October 1, 2007, reflect that the Operator was not performing effectively as a manager.  The Operator was "overwhelmed" with marketing duties.  In view of the circumstances, Findlay and Bernarduci suggested that the Operator be placed on probation for six weeks.  The minutes show that Hoste attended the meeting, but no indication exists that Hoste was involved in the proposed acquisition by the Operator.

8.   On October 10, 2007, the Operator and Hoste applied together for a loan from Northwest Community Bank to purchase UCRC for $650,000.00.

9.   Hoste orally communicated to Miller certain concerns that Hoste had about the contemplated acquisition of UCRC.  Among Hoste's concerns were that Hoste himself lacked financial capacity either to purchase UCRC or to contribute capital towards the financing of an acquisition of UCRC; that the Operator had insufficient knowledge of the chiropractic field; and that Hoste was unsure how to structure the transaction.  D.E. 1 at ¶ 13; D.E. 33 at ¶ 1.[2]

10.   In approximately November or December 2007, Hoste asked Miller in a telephone conversation to buy the UCRC practice with him.  D.E. 90 at ¶ 13; D.E. 99 at ¶ 3.  Miller contends that Miller offered him a 50% ownership of UCRC, but Hoste states that the amount of ownership that Hoste was willing to offer Miller was flexible and dependent upon what Miller did in

---

[2]While Defendant's Statement of Material Facts claims that "Defendant denied most of the allegations of Plaintiff's paragraph 13 of the Complaint," the Court disagrees.  Instead, Defendant's Answer and Amended Affirmative Defenses denied matters that are not alleged in paragraph 13 of the Complaint.  *See* D.E. 13 at ¶ 1 (denying "speaking to Miller about the amount of the purported purchase at the time described or, at any time, about the alleged proportion of ownership in Miller of any interest in UCRC, Inc. or UCRC Holdings, Inc.").  Accordingly, the allegations contained in paragraph 13 of the Complaint — and in paragraph 12 of Plaintiff's Statement of Material Facts — is deemed admitted.

furtherance of the purchase and operation of UCRC. *See* D.E. 90-2 at 57:18-59:7. Hoste further claims — and Miller disputes — that Hoste was willing to give Miller a 50% interest in the acquisition of UCRC only if Miller would serve as a guarantor on the loan for the purchase of UCRC, although nothing in the record indicates that Hoste conveyed this information to Miller, even if he thought it to himself. Moreover, despite being deposed and asked in what way Miller misrepresented his services in helping to obtain a loan for the purchase of UCRC, Hoste's first mention of his contention that Miller's 50% ownership was contingent upon Miller's guaranty of the UCRC purchase loan appears in Hoste's Affidavit filed in opposition to Miller's Motion for Summary Judgment. *See* D.E. 99 at ¶ 4 ("[W]hen Miller and I discussed being partners, we did not discuss the percentage that each of us would have in the Company. However, I would not agree to Miller being a fifty per cent partner with me unless he was also going to be on the loan individually as a Guarantor"). Finally, Hoste states that although he denies having told Miller that Miller would have a 50% interest in UCRC, if he did make such a statement, that occurred before Miller failed to qualify as a guarantor and before Hoste "observed that Miller was not able to market UCRC effectively." D.E. 98 at ¶ 32.

11. Findlay and Bernarduci were willing to sell to Hoste and Miller, whereas they were not willing to sell to Hoste and the Operator, because Miller had successfully run chiropractic business, and the Operator had not. Further, Miller was bringing some money to the table and had some marketing knowledge.

12. The UCRC minutes of January 1, 2008, reflect that the Operator was removed effective November 15, 2007, from all corporate activities. They further state "that a new offer was being presented by Dr. Gary Hoste and Jeffrey Miller which would be submitted for approval on 1/6/08."

-5-

Bernarduci expressed "high confidence" in Hoste and Miller and noted Miller's "vast experience in the industry" and "extensive experience in the financing and loan [sic]."

    13.  On January 16, 2008, Miller wired a $10,000.00 good-faith deposit for the purchase of UCRC to the Bank of America IOLTA account of the UCRC attorney.

    14.  Some time between December 2007 ant June 2008, Miller and Hoste met with the Deputy Mayor of the City of Sunrise, Donald K. Rosen.  During that meeting, Miller, Hoste, and Rosen discussed the logistics of developing a chiropractic venture in Sunrise, including the logistics of corporate marketing, regulatory requirements, and participation in the municipal insurance plan. Rosen recalls that Hoste expressly represented to Rosen at that time that Miller was his "50/50 partner" in the acquisition of UCRC.  D.E. 90-10 at ¶ 5.  Hoste disputes that he ever made such a statement, but he states that if he ever did say "anything similar to that, it was prior to Miller failing to qualify as a guarantor and before Hoste observed that Miller was not able to market UCRC effectively."  D.E. 98 at ¶ 32.

    15.  In March 2008, a CIT Small Business Lending Corporation representative orally advised Hoste and Miller that Hoste should be listed on the loan documents as an 85% owner of the purchasing entity because Hoste's personal credit rating was better than Miller's.

    16.  Therefore, Hoste and Miller agreed that, for purposes of securing the loan for the purchase of UCRC, Hoste and Miller would be listed on all CIT loan documents as having 85% and 15% ownership interests, respectively, in UCRC.

    17.  The application submitted to CIT Small Business Lending Corporation in order to obtain a loan of $470,000 to purchase UCRC identifies Hoste as the intended 85% owner and Miller as the intended 15% owner of the company.  *See* D.E. 92-2 at 77-79.  In addition, the CIT Small Business

Exhibit "8"

Lending Corporation "Credit Write-Up/Corp. to be Formed & UCRC, Inc. dba Universal Chiropractic" describes Miller as the 15% owner of the Borrower/Purchaser.

18.  Miller drafted a written marketing plan for UCRC for the CIT loan application.

19.  Hoste personally guaranteed the loan because Hoste had better credit than Miller, and Miller did not want to serve as the guarantor on the loan because he was concerned that if anything happened to Hoste and Miller was not licensed practice in Florida, Miller would be left liable.  D.E. 90-1 at 152:24-153:14.

20.  Miller did not complain about being listed as only a 15% owner because he wanted the loan to close on time.  At the time that Miller and Hoste signed the loan application, neither one was a shareholder.  Miller and Hoste had an agreement that did not appear in the loan application that Miller would be allowed after the closing to purchase 35% of UCRC's shares for $35.

21.  On March 3, 2008, Miller paid the application fee of $2,000.00 and the fingerprinting fee of $42.25 for the Florida AHCA application relating to the purchase of UCRC.  The monies were paid by checks drawn on Miller's Tower Equity Group business account.  On the AHCA application, Miller stated that he was to be a 15% shareholder of AHCA.

22.  On about March 6, 2008, Hoste and Miller, as the designated "Purchasers," entered into a Stock Purchase Agreement ("UCRC Stock Purchase Agreement") with Bernarduci and Findlay, as Sellers, pursuant to which the Sellers agreed to deliver 100% of the outstanding shares of UCRC, Inc., in consideration of a $475,000.00 purchase price.  Although Miller and Hoste both negotiated the contract with the Sellers, D.E. 99 at ¶ 5, Miller was responsible for negotiating the purchase price for UCRC down to $475,000 from the price of $776,500 that the Operator had previously agreed to pay, D.E. 93-1 at Response to Request No. 2.

-7-

23. The UCRC minutes of April 1, 2008, report that the proposed closing date of the sale to potential owners Gary Hoste and Jeffrey Miller was nearing and that Bernarduci, who was in contact with Miller on a regular basis, would update the company as to a final closing date.

24. On April 30, 2008, Hoste signed an agreement with Miller in which Hoste represented himself as the "record owner[] and holder[] of 85% of the outstanding shares of the capital stock of UCRC, Inc." (the "35% Agreement"). D.E. 1-6. The 35% Agreement further provided that "in consideration of the mutual covenants and agreements contained in [the 35% Agreement], and in order to consummate the purchase and the sale of [UCRC's stock], it is hereby agreed . . . [that Hoste] shall convey, transfer and deliver to [Miller] certificates representing 35% of the total UCRC stock [for total consideration of $35.00] . . . on May 30, 2008, or within 60 days of May 30, 2008 at [Miller's] discr[e]tion . . . ." *Id.*

25. CIT Small Business Lending Corporation had knowledge and assented to the executory transfer of shares of 35% of the corporation from Hoste to Miller.

26. The UCRC minutes of June 2, 1998, reflect that "Dr. Findlay and Kent Bernarduci as sole and equal shareholders do hereby unanimously agree to approve the sale of 100% of the UCRC, Inc. stock to Dr. Gary Hoste and Jeffrey Miller provided all contract and closing requirements are met pursuant to the time constrain[t]s of the contract."

27. Miller wrote a personal check dated June 19, 2008, to Gary Hoste for $1,350. D.E. 93-1 at 17-18. In the memo section o f the check, the check appears to say "Cont. pymt." *Id.* The ledger for this check indicates "Ind. Contractor & pymt." Miller contends that this check was payment for an independent contractor and for the $35.00 for the 35% of the shares. No other evidence, including a cover letter, a memo, an email, or any type of confirmation that would tend to corroborate Miller's

-8-

position is a part of the record.  Hoste asserts that he was never paid for the 35% of the shares and that the $1,350 had nothing to do with payment for the 35% of the shares.

28.  The CIT Small Business Lending Corporation documents reflect that Miller and Hoste were required to form a new entity, namely UCRC Holdings, Inc. ("UCRC Holdings"), for the purpose of acquiring 100% of the UCRC stock from Findlay and Bernarduci.

29.  Accordingly, Hoste and Miller incorporated UCRC Holdings on June 30, 2008.  The articles of incorporation designate Miller as the vice president and secretary and Hoste as the president, director, registered agent, and incorporator.  They do not set forth the proportional ownership between Miller and Hoste.

30.  On June 30, 2008, the loan from CIT Small Business Lending Corporation in the amount of $470,000 was consummated, and 100% of the stock of UCRC was acquired for $475,000.  The CIT loan documents specifically required that the new or transferred stock certificates in the name of UCRC Holdings be brought to the closing and returned to CIT.

31.  On June 30, 2008 (the date of the closing), Miller was at the UCRC office and witnesses Hoste sign various documents.  The closing was not formal; it involved the exchange of documents by facsimile.

32.  On June 30, 2008, Findlay and Berarduci each trasnferred 100 shares of stock to UCRC Holdings by way of an endorsement that appointed Hoste to transfer the shares on the books of UCRC Holdings.

33.  Hoste did not transfer the shares on the books of UCRC Holdings on June 30, 2008.  At a time and date that is not specified in the record, Hoste issue3d to himself two certificates of 100 shares each of UCRC and one certificate of 200 shares of UCRC Holdings, both of which reflect a

Exhibit "8"

date of June 30, 2008.

34.  The June 30, 2008, loan documents include a sworn affidavit from Hoste in which Hoste attests that as of that date, the borrower's ownership is as stated on the loan application (85% Hoste, 15% Miller).

35.  The documents submitted in support of the loan application identify Miller and Hoste as the "Buyers" and "Purchasers" of the entity acquiring UCRC.  Miller is further designated as the secretary of UCRC Holdings.

36.  During the period before the acquisition of UCRC, Miller began to live part-time with Hoste at the Wave Condominium in Hollywood Beach.  Beginning at the end of 2007, Miller traveled to Florida one to two times each month initially for eight to nine days per month and then more frequently as the closing date of June 30, 2008, approached (up to fifteen days each month).

37.  Before the acquisition of UCRC, Miller was instrumental in (1) negotiating the terms of a stock purchase agreement with Findlay and Bernarduci for the acquisition of UCRC; (2) working with CIT Small Business Lending Corporation to consummate the approval of the small business loan for the purchase of UCRC; and (3) applying for and procuring health-care licensure from Florida AHCA.

*C.  The Events Occurring After the Acquisition of UCRC*

38.  On July 2, 2008, AHCA accepted the application for health care licensure that was based on an application where Miller was designated as a 15% owner of UCRC.

39.  Before and after the acquisition of UCRC, Miller marketed UCRC by meeting with various lawyers, lawyers' representatives, and City of Sunrise officials.  D.E. 90 at ¶ 27.  Miller also set up marketing events at a local spa.  *Id.*  Despite these activities, Miller's marketing efforts never

-10-

produced even one dollar for UCRC. D.E. 98 at ¶ 27.

40. In about September 2008, Miller canceled marketing events for UCRC because Hoste was ignoring deadlines about which Miller had repeatedly notified Hoste by email.

41. Miller feared a squeeze-out by Hoste and therefore noticed an October 14, 2008, special meeting of the officers and directors of UCRC Holdings.

42. On October 3, 2008, Hoste unilaterally amended the articles of incorporation of UCRC Holdings to reflect that Hoste was the sole initial officer or director, or both, of the corporation. The articles of amendment to the UCRC articles of incorporation represented that the adopted amendment was approved by a majority of vote of the shareholders. Hoste signed this representation.

43. On October 6, 2008, Hoste submitted to AHCA an application for certificate of exemption for licensure. This application, which represented that UCRC is "100% [Florida-licensed] physician owned by Dr. Gary Hoste, D.C.," was approved on October 14, 2008.

44. Hoste admitted that he knew of no corporate action that was taken to remove Miller as a 15% owner of UCRC Holdings. Instead, Hoste said, "The shares were signed over to me as president 100%, and that's the only action that I can recall that occurred."

45. The UCRC and UCRC Holdings tax returns reflect that Miller has never been issued a Schedule K-1.

46. On March 13, 2009, Hoste filed electronic articles of organization for CBA Health & Wellness, LLC ("CBA"), a Florida limited liability company of which he is the 100% owner. Like UCRC, CBA does business under the fictitious name, "Universal Chiropractic."

47. According to the articles of organization, CBA provides chiropractic services. Until

-11-

2011, CBA Wellness and UCRC were at different locations and were run separately. Since that time, however, Hoste is unable to distinguish CBA from UCRC in terms of its employees, its services, or its customers.

48. Preferential distributions were paid exclusively to Hoste from UCRC Holdings in the following amounts: 2008: $19,834; 2009: $212,216; 2010: $213,410. This totals $445,460.

49. Preferential distributions were paid exclusively to Hoste from CBA in the following amounts: 2011: $99,118. The aggregate amount of preferential distributions to Hoste from UCRC Holdings and CBA during the relevant period is approximately $545,000.

50. In addition, between 2008 and 2011, Hoste at least another $427,462 was spent. Miller contends this money was "constructive dividends," while Hoste asserts without financial support that it was "legitimate business deductions."

### *III. Summary Judgment Standard*

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Not any factual dispute will defeat a motion for summary judgment; rather, "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A dispute is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (citing *Anderson*, 477 U.S. at 247-48). A fact is material if "it would affect the outcome of the suit under the governing law ." *Id.* (citing *Anderson*, 477 U.S. at 247-48).

In deciding a summary judgment motion, the Court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *See Davis v.*

Exhibit "8"

*Williams*, 451 F.3d 759, 763 (11th Cir. 2006). Further, the Court does not weigh conflicting evidence. *See Skop v. City of Atlanta*, 485 F.3d 1130, 1140 (11th Cir. 2007). Thus, upon discovering a genuine dispute of material fact, the Court must deny summary judgment. *See id.*

The moving party bears the initial burden of showing the absence of a genuine dispute of material fact. *See Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008) (per curiam). Once the moving party satisfies this burden, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs., LLC*, 327 F. App'x 819, 825 (11th Cir. 2009) (per curiam) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Instead, "[t]he non-moving party must make a sufficient showing on each essential element of the case for which he has the burden of proof." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Accordingly, the non-moving party must produce evidence, going beyond the pleadings, to show that a reasonable jury could find in favor of that party. *See Shiver*, 549 F.3d at 1343.

### *IV. Discussion*

Plaintiff seeks summary judgment on Counts I, VII, and VII of his Complaint. The Court considers each below.

#### *A. Count I*

In Count I of the Complaint, Miller seeks a declaratory judgment that (1) Hoste has willfully and oppressively "squeezed out" Miller as an officer, director, and shareholder of UCRC Holdings, and (2) Miller has a vested interest as a 50% shareholder of UCRC Holdings with a commensurate right to 50% of profits and distributions of UCRC Holdings, UCRC, and CBA. In the alternative to the second requested declaration, Miller asks for a declaratory judgment that Miller has a vested

-13-

interest as at least a 15% shareholder of UCRC Holdings, Inc., with a commensurate right to at least 15% of profits and distributions of UCRC Holdings, Inc., UCRC, Inc., and CBA.

Essentially, Miller seeks the requested declaratory judgment based on an alleged oral contract between himself and Hoste regarding the ownership of UCRC and UCRC Holdings. Oral contracts are "subject to the basic requirements of contract law such as offer, acceptance, consideration and sufficient specification of essential terms." *St. Joe Corp. v. McIver*, 875 So. 2d 375, 381 (Fla. 2004) (citation omitted). If nonessential terms are left open, that fact will not preclude the finding of an oral contract. *Id.* (citation omitted). A party who claims the existence of an oral contract bears the burden of proving the oral contract by a preponderance of the evidence. *Id.* (citation omitted).

In addition, the parties to an oral contract can modify the contract through a subsequent agreement. *Id.* (citations omitted). In determining whether a contract has been modified, the court may consider the actions of the parties. *Id.* at 382 (citations omitted). But a party cannot modify a contract unilaterally. *Id.*

Based on the record in this case, the Court finds that Miller and Hoste entered into an oral contract for the ownership of UCRC, with Miller to enjoy at least a 15% share of UCRC and Hoste to have no more than an 85% share. Both the paper trail and the parties' actions indisputably prove the existence of such an oral contract. First, the application submitted to CIT Small Business Lending Corporation in order to obtain a loan of $470,000 to purchase UCRC identifies Hoste as the intended 85% owner and Miller as the intended 15% owner of the company. In addition, the underlying paperwork supporting the loan, which closed on June 30, 2008, identifies both Hoste and Miller as the "buyers" and "purchasers" of UCRC Holdings, which was buying UCRC. Significantly, Hoste signed and personally guaranteed the loan that was based on this paperwork,

Exhibit "8"

evidencing his knowledge and assent to the contents of the supporting paperwork. And, on April 30, 2008, Hoste signed an agreement with Miller in which Hoste represented himself as the "record owner[] and holder[] of [only] 85% of the outstanding shares of the capital stock of UCRC, Inc." Hoste does not deny the authenticity of any of these documents. Moreover, the contract is supported by the consideration that Miller provided in the form of involvement in negotiating the deal for the sale of UCRC, helping to obtain the financing for the loan, providing financial support for the deal, contributing his business acumen, and marketing the practice.

Under these circumstances, Hoste's naked denials that he entered into such a contract with Miller cannot satisfy his burden to show a material issue of fact in the face of the uncontroverted documentary evidence proving the existence of the oral contract. Even Hoste, at best, tries to spin his offer to Miller of ownership of UCRC by stating that the amount of ownership that Hoste was willing to offer Miller was flexible and dependent upon what Miller did in furtherance of the purchase and operation of UCRC. In light of the undisputed evidence of record, however, no reasonable factfinder could conclude that Hoste and Miller did not enter into an oral contract for the ownership of UCRC and UCRC Holdings in an amount of at least 15% for Miller and 85% for Hoste.

Hoste's apparent attempt to show a failure of consideration must likewise fail. Specifically, Hoste argues that even if he agreed with Miller to share the ownership of UCRC in some way, he did so before Miller did not serve as a guarantor on the CIT loan and before Hoste observed Miller's alleged marketing failures. First, the timing and content of Hoste's decision to guarantee the CIT loan belies his claim that part of the consideration for Miller to obtain shares of UCRC included his serving as a guarantor on the CIT loan. The conversation with the CIT representative in which

Exhibit "8"

Miller and Hoste agreed that Miller would be a 15% owner and Hoste would be an 85% owner and that Hoste would guarantee the loan — because of Hoste's better credit rating than Miller's — occurred in early March 2008. Indeed, by March 3, 2008, Miller was submitting a licensure form to AHCA with the 15%/85% ownership interests already listed. Moreover, just to obtain the loan, Hoste had to guarantee the loan, which was based on the underlying paperwork showing a 15%/85% split of UCRC between Hoste and Miller. Obviously, Hoste knew at the time that he guaranteed the loan that Miller would not be serving as a guarantor on the loan. Yet he still filed the application for the loan reflecting a 15%/85% ownership split. If Hoste were going to claim that Miller's refusal to serve as a guarantor of the loan resulted in a failure of consideration, he would have refiled the loan application documents based on an intended 100% ownership interest in UCRC.

Not only that, but nearly two months passed between these events and Hoste's reaffirmation of the 85%/15% split in the 35% Agreement — and four months elapsed between these events and Hoste's closing on June 30, 2008, on the loan based on 85%/15% split paperwork. Again, if a failure of consideration based on Miller's declination to guarantee the loan had occurred, there would have been no reason for Hoste to have signed the 35% Agreement or to have closed on the loan on June 30, 2008, with the paperwork reflecting the 15%/85% split underlying the loan. Moreover, Hoste's signing of the 35% Agreement, which expressly confirms that Miller's ownership of UCRC is limited to 85%, proves Miller's vested anticipated ownership of 15% of UCRC as of April 30, 2008.

For the same reason, Hoste is unable to create a material issue of fact concerning failure of consideration based on Miller's alleged marketing failures. Even setting aside the fact that the record contains no evidence that Hoste advised Miller that Miller's marketing activities were required to bring in a certain number of clients (so there is no evidence of a meeting of the minds with respect

-16-

to this alleged condition of the contract), the record is clear that Miller engaged in marketing activities well before the UCRC deal was consummated. In fact, Miller prepared a marketing plan for UCRC in support of the CIT loan application and he met with lawyers, city officials, and others to promote UCRC. After these marketing activities, Hoste ratified the 15%/85% ownership split for UCRC in documents submitted in support of the CIT loan application when he closed on the CIT loan on June 30, 2008, and when he signed the 35% Agreement — even though he must have known at those times that the marketing efforts had not resulted in any new patients. In short, a reasonable factfinder could conclude only that Miller and Hoste entered into an agreement for ownership of UCRC in an amount of at least 15% for Miller and no more than 85% for Hoste. The fact that, in hindsight, Hoste might view this as a bad deal does not make it any less of a binding contract.

Whether this contract was later modified to adjust the ownership of UCRC to 50% for each party, however, is the subject of a dispute over material issues of fact. While Hoste plainly signed the 35% Agreement allowing for the possibility that Miller would be able to obtain up to 50% of the ownership of UCRC, whether the $35.00 consideration was ever paid to Hoste within the required time frame remains an open question.

On the one hand, Miller states that he made the required payment in a check dated June 19, 2008, for $1,350. But Hoste denies that the check at issue included payment for the 35 shares, and, on its face, the check does not appear to indicate that it is for payment for the 35 shares. Nor has Miller come forward with any other documentation to demonstrate payment for the 35 shares within the requisite period. Under these circumstances, summary judgment is not appropriate, as a material issue of fact remains in dispute. Therefore, summary judgment on Count I is granted in part and denied in part, consistent with the terms of this Order.

-17-

Exhibit "8"

*B.  Counts VII and VIII*

Count VII alleges that Hoste breached his fiduciary duty to UCRC by engaging in the following activities:

a.    compensating himself excessively and making preferential illicit distributions to himself, which also constitutes corporate waste pursuant to Fla. Stat. § 607.07401;

b.    failing to disclose all material information, including the corporate records and financial information relating to the operations UCRC;

c.    exceeding the scope of his authority by instructing CPA Bob Hovenan to deny Miller, a 50% shareholder, access to financial information relating to the operations of UCRC;

d.    squeezing out Miller from the operation and enjoyment of the enterprise without consideration;

e.    converting Miller's personal property interest in UCRC, for his own personal benefit and thus depriving Miller of his direct, indirect, derivative or residual interest in UCRC's book of business and/or its benefits.

f.    refusing to pay Miller (the other shareholder) while making preferential distribution to himself;

g.    diverting or misappropriating revenues from the operations of UCRC solely for his personal benefit.

h.    usurping corporate opportunities; and

i.    wasting corporate assets by failing to take advantage of Miller's special expertise as a developer of corporate markets.

D.E. 1 at 21-22.

Similarly, Count VIII asserts that Hoste breached his fiduciary duty to UCRC Holdings by doing the following:

-18-

a.  compensating himself excessively and making preferential illicit distributions to himself, which also constitutes corporate waste pursuant to Fla. Stat. § 607.07401;

b.  failing to disclose all material information, including the corporate books and records and financial information relating to the operations of UCRC Holdings;

c.  squeezing out Miller from the operations and enjoyment of the enterprise without consideration;

d.  making a material misrepresentation to the Florida Secretary of State that a majority vote was taken at a shareholder meeting to oust Miller as an officer and director of UCRC Holdings, when in fact no such meeting was held and no such majority vote was taken;

e.  converting Miller's personal property interest in UCRC Holdings for his own personal benefit and thus depriving Miller of his direct, indirect, derivative or residual interest in UCRC Holdings' book of business and/or its benefits.

f.  refusing to pay Miller (the other shareholder) while making preferential distribution to himself;

g.  diverting or misappropriating revenues from the operations of UCRC Holdings solely for his personal benefit; and

h.  usurping corporate opportunities.

D.E. 1 at 23-24.

Before the Court can address whether summary judgment may be granted on these counts, it must first consider whether, as Miller suggests, Counts VII and VIII may be construed as claims that Hoste breached his fiduciary duty to Miller personally, instead of viewing the counts as they are pled — that is, as derivative shareholder claims.  Plaintiff correctly asserts that Florida does recognize an individual claim by a minority shareholder against a majority shareholder for breach of duty.  *See Hodges v. Buzzeo*, 193 F. Supp. 2d 1279, 1288 (M.D. Fla. 2002) (citing *Tillis v. United*

-19-

*Parts, Inc.*, 395 So. 2d 618, 619 (Fla. 5th DCA 1981) (citation omitted)). The inquiry into whether a claim for breach of fiduciary duty by a majority shareholder may be brought as an individual (or direct) suit or whether, instead, it must be pursued as a derivative suit rests on the following considerations:

> An action brought by a stockholder is derivative if the gravamen of the complaint is injury to the corporation or to the whole body of its stock or property and not injury to the plaintiff's individual interest as a stockholder. . . . Conversely, direct action, or as some prefer, an individual action, is a suit by a stockholder to enforce a right of action existing in him. What these definitions attempt to convey is that a stockholder may bring suit in his own right to redress an injury sustained directly by him, and which is separate and distinct from that sustained by other stockholders. If, however, the injury is primarily against the corporation, or the stockholders generally, then the cause of action is in the corporation and the individual's right to bring it is derived from the corporation. . . .

*Id.* (quoting *Alario v. Miller and Miller*, 354 So. 2d 925, 926 (Fla. 2d DCA 1978)).

Based on these distinctions, in this case, some of the alleged breaches of fiduciary duty could be brought individually by Miller, but others could not. For example, "wasting corporate assets by failing to take advantage of Miller's special expertise as a developer of corporate markets" causes injury to the corporation, not directly to Miller personally. Therefore, it must be pursued derivatively. But claims such as "squeezing out Miller from the operations and enjoyment of the enterprise without consideration" allegedly inflict injury directly on Miller and thus could be brought individually.

Here, regardless of how the claims could be brought, however, they are actually pled as derivative claims. Nonetheless, Miller urges the Court to disregard the form of Counts VII and VIII and to treat them as though they are brought individually. In support of this approach, Miller directs

-20-

the Court to *Donahue v. Rodd Electrotype Co. of New England, Inc.*, 328 N.E.2d 505, 508 n.4 (Mass. 1975). In that case, the court elected to analyze claims that were pled derivatively as though they had been pled directly where those claims could have been brought directly. In providing the basis for proceeding this way, the court noted that the parties had all treated the claims as though they had been pursued directly, and the case was tried that way as well, apparently without any objection by the opposing party. *See id.* As a result, the court explained, "In this instance we prefer substance over form and decide the case on this basis." *Id.* Noting that Florida courts have cited *Donahue* favorably regarding the existence of a fiduciary duty on all shareholders in a close corporation, Miller implicitly suggests that it is no stretch to believe that Florida courts would likewise adopt *Donahue*'s approach to breach-of-fiduciary claims that could have been brought directly but were, in fact, pled derivatively.

The problem with Miller's position arises from the language of *Donahue* itself. As noted above, *Donahue* limits its substance-over-form approach to the unique circumstances that existed in that case — that is, the parties all proceeded through an entire trial and through appellate proceedings as though the claims had been brought directly, even though they had been pled derivatively. That is not the case here. First, unlike the *Donahue* defendants, Hoste challenges Miller's attempt to ignore the form in which he chose to plead his breach-of-fiduciary-duty claims. Second, no trial has yet occurred in this case, so the investment of the parties' resources, as well as judicial resources, is substantially less than it was in *Donahue*, where both trial and appellate proceedings had already occurred. Third, allowing, as a matter of course, parties to proceed directly after having pled derivatively would create uncertainty for defendants regarding the nature of the charges that they face. If a party means to proceed individually, that party should plead his claim

-21-

individually. The Federal Rules of Civil Procedure rely on a *notice*-pleading system. *See* Fed. R. Civ. P. 8(a); *see also Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, (2007). Therefore, barring an opposing party's acquiescence in the treating of claims pled derivatively as though they were brought individually, this Court declines to extend *Donahue* to the facts presently before the Court. As a result, summary judgment on Counts VII and VIII must be denied.[3]

## *V. Conclusion*

For the foregoing reasons, Plaintiff Jeffrey Miller's Motion for Partial Summary Judgment [D.E. 88] is **GRANTED IN PART and DENIED IN PART**, consistent with the rulings set forth in this Order. Plaintiff's Motion is granted in part and denied in part with respect to Count I and denied with regard to Counts VII and VIII.

**DONE and ORDERED** at Fort Lauderdale, Florida, this 6th day of March 2013.

ROBIN S. ROSENBAUM
UNITED STATES DISTRICT JUDGE

copies:

The Honorable Barry S. Seltzer
Counsel of Record

---

[3]The Court further notes that even if it determined that consideration of Counts VII and VIII as though they were individually brought were appropriate, material issues of fact exist concerning these counts. For example, both counts allege that Hoste diverted or misappropriated revenues from the operations of the companies solely for his personal benefit, but Hoste contends that payments from the corporation were legitimate business expenditures. No evidence to support either theory has been filed on the record.

-22-

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 11-61946-CIV-ROSENBAUM

JEFFREY MILLER,

      Plaintiff,

vs.

GARY HOSTE, UCRC, INC., and
UCRC HOLDINGS, INC.,

      Defendants.

_____/

### FINAL JUDGMENT UPON CONSENT

    This matter is before the Court upon Plaintiff's Motion for Entry of Final Judgment [D.E. 112], Defendant Gary Hoste's Confession of Judgment [D.E. 112-1], and the parties' Joint Stipulation of Dismissal With Prejudice. [D.E. 113]. The parties have agreed to the entry of final judgment against Gary Hoste in the amount of $500,000.00 with respect to Count I of the Complaint and to the voluntary dismissal of the remaining counts of the Complaint. Accordingly, it is hereby **ORDERED and ADJUDGED** as follows:

1.    Plaintiff's Motion for Entry of Final Judgment [D.E. 112] is **GRANTED**;

2.    The Court enters judgment against Defendant Gary Hoste and in favor of Plaintiff Jeffrey Miller in the amount of $500,000.00;

3.    The Court shall retain jurisdiction over this matter to enforce the settlement between the parties;

4.    The Clerk shall **CLOSE** this case and **DENY AS MOOT** any pending motions.

    As agreed, the parties are to bear their own costs and attorney's fees.

    **DONE and ORDERED** in Fort Lauderdale, Florida, this 8th day of April 2013.

                  _____
                  ROBIN S. ROSENBAUM
                  UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of record